631 F.2d 449
 Gertrude REMINGA, Executrix of the Estate of Thomas H.
Reminga, Deceased, and Barbara Sue Breeden,
Executrix of the Estate of James Robert
Breeden, Deceased, Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant.
 No. 78-1154.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 10, 1980.
Decided Oct. 2, 1980.
Rehearing Denied Oct. 28, 1980.
 
 James S. Brady, U. S. Atty., Robert C. Greene, Asst. U. S. Atty., Grand Rapids, Mich., Ronald R. Glancz, Frederic D. Cohen, Michael J. Pangia, Asst. Chief Counsel, Litigation Division, Federal Aviation Administration, Washington, D. C., for defendant-appellant.
 Russell H. Volkema, Volkema & Pees, Columbus, Ohio, for Reminga.
 Richard Walsh, Kalamazoo, Mich., for Breeden.
 Before EDWARDS, Chief Judge, LIVELY, Circuit Judge, and PHILLIPS, Senior Circuit Judge.
 LIVELY, Circuit Judge.
 
 
 1
 In this Federal Tort Claims Act[1] case the district court entered judgment for the plaintiffs upon a finding that acts and omissions of two federal regulatory agencies were negligent. The plaintiffs are the widows and executrices of two passengers in a small private airplane who were killed when the plane struck a guy wire which supported a tall television tower. The district court found negligence and proximate cause in three agency actions and omissions: (1) the government was found negligent for publishing a "sectional chart" which showed the TV tower in the wrong location; (2) the Federal Aviation Administration (FAA) was found negligent in issuing a "no hazard determination" when construction of the tower was proposed; and (3) the FAA and the Federal Communications Commission (FCC) were found negligent for failing to require additional lighting or marking "so as to safeguard pilots who are in the area from striking the guy-wires of such a tower, or at least to have inquired into the feasibility of marking the wires." Reminga v. United States, 448 F.Supp. 445, 469 (W.D.Mich.1978).
 
 I.
 
 2
 The decedents were returning to their homes in Michigan from a hunting trip in Wisconsin when the fatal crash occurred. Though both were licensed pilots, the district court found that the plane was being operated by the third occupant whose father's business owned it. This finding is supported by the evidence. The plane took off from the Land O'Lakes Airport near Rhinelander on November 17, 1968 at approximately 2:30 p. m. and crashed at approximately 2:52 p. m. some seventeen miles south-southeast of the airport. None of the occupants of the plane was licensed for instrument flying and the flight was to be conducted under Visual Flight Rules (VFR). The "flight minimums" for the trip were that the area be free of clouds and that the pilot have one mile visibility as long as he flew outside of controlled airspace. 14 C.F.R. § 91.105(a). The district court found that though the weather was "marginal," conditions were above the minimums at the time of take off. The plane reported to the airport when it was 12 miles south that it was flying at 600 feet with about 3 miles visibility.
 
 
 3
 The district court found that a mixture of rain and snow was falling and the plane was flying in and out of clouds just before the crash. The court also found that the top of the 1720-foot tower was obscured at the time of the collision and that the plane struck a guy wire approximately 450 feet above the ground and approximately 1850 to 1900 feet from the base of the tower itself. The tower was supported by three guy wires which extended laterally approximately 2500 feet from the base of the central structure. Though the tower itself was painted and illuminated in accordance with FCC regulations (47 C.F.R. Part 17, Subpart C), there were no lights or other markings on the guy wires.
 
 II.
 A.
 
 4
 The government issues sectional maps or charts for various areas of the country. The district court found that the occupants of the plane were using the Green Bay sectional map. It is undisputed that the location of the TV tower was shown inaccurately on this chart. The map showed the tower west of the town of Starks, Wisconsin and south of nearby railroad tracks whereas its actual location was north of Starks and north of the tracks. The district court found that this displacement would create a problem for a VFR pilot who would normally use a railroad line as a visual reference point. This finding was supported by the testimony of an experienced pilot, Richard G. Hartman, who was called by the defendant. Hartman testified that knowing where things are "is number one" in importance for a pilot and it is very important that obstructions to navigation be put on a map correctly.
 
 
 5
 The government contends the finding that the occupants of the plane relied on the Green Bay sectional map is clearly erroneous. The circumstantial evidence would support a finding that the pilot was actually using an aeronautical map of the State of Wisconsin issued by a private publisher rather than the Green Bay sectional chart. Nevertheless, there was evidence from which the district court could have found that the government chart was being used. On this record we are unable to conclude that the district court's finding is clearly erroneous. Having determined that the finding of reliance on the Green Bay sectional map was not clearly erroneous, we do not reach the district court's alternate finding that the Wisconsin map, which also misplaced the tower, was merely copied from the sectional map.
 
 B.
 
 6
 The government also contends that the displacement of the symbol for the TV tower could not have been the proximate cause of the crash. It is contended that sectional charts are intended for use by pilots to determine their "general location by reference to objects on the ground," and that "a pilot cannot rely on any map to visually thread his way through the needles which would be encountered by flying under 500 feet in uncontrolled and unavigable airspace in bad weather." This argument overlooks the district court's finding that although the plane took off with legal minimums and had three miles visibility when 12 miles from the airport, deteriorating weather (mixed rain and snow) caused the pilot to descend further to be able to fly according to VFR. As he approached the point of collision, the top of the tower was hidden and the pilot was moving in and out of clouds. In this situation it was essential that the pilot know the correct location of obstructions to navigation. We cannot say the district court was clearly erroneous in finding that the issuance of the map which showed the location of the tower in the wrong place was the proximate cause of the crash.
 
 
 7
 Though not required by law to do so,[2] when the FAA arranges for the publication of aeronautical navigation charts and engenders reliance on them, it is required to use due care to see that they accurately depict what they purport to show. Failure to show the location of the tower accurately rendered the United States liable for injury to those who relied upon the chart. See Indian Towing Co. v. United States, 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955); Ingham v. Eastern Airlines, Inc., 373 F.2d 227, 236 (2d Cir.), cert. denied, 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967).
 
 C.
 
 8
 The government contends vigorously that recovery in this case is precluded by the Michigan rule of contributory negligence. The district court, applying Michigan law, recognized that at the time of the fatal crash contributory negligence was an absolute bar to recovery. The government contends the weather was so unsuitable for VFR flying that it was negligent to begin the trip, and negligent not to turn back when the weather worsened. However, the court found no contributory negligence. Since all three occupants of the plane were licensed pilots and there was evidence that more than one engaged in inquiries about the weather before their departure, the court found that all participated in the decision to take off. Nevertheless, the court stated: "However, the weather is not the primary cause of this crash. The only influence the weather had was to force the decedents' plane to fly at an altitude much lower than they normally would have done, thus forcing them to go around the tower rather than over it; the weather also obscured the guy-wires to an extent that a large and potentially hazardous obstruction was transformed into a fatal hazard." 448 F.Supp. at 465.
 
 
 9
 There was evidence from which a finding of contributory negligence might have been made. However, the district court, as trier of the facts, found evidence to the contrary more persuasive. Though the weather was marginal at take off, several witnesses who were pilots testified that they had flown in such conditions. The radio report from 12 miles out indicated that the weather was improving. Thus, there was no duty to turn back. Eyewitness accounts of the crash established that there were low-lying clouds in the immediate area of the tower. The plane was flying south. The sectional chart showed the tower west of Starks and south of the railroad tracks. In approaching the area, the pilot could reasonably expect to see the railroad tracks before he came upon the tower. We cannot say it was negligent for the pilot to fly within 1900 feet of the tower while still north of the tracks. If the tower had been accurately located on the chart there would be some force to the government's argument that the pilot was negligent in flying so close to it. Not knowing its true location, and flying in and out of clouds, however, he may not be charged with negligence on this score. The finding of no contributory negligence was not clearly erroneous.
 
 III.
 
 10
 The district court premised liability on two other grounds, both involving alleged improper actions and failures of regulatory agencies. We reject these determinations for the reasons hereinafter set forth.
 
 A.
 
 11
 Any person proposing to construct or alter an object more than 200 feet above ground level at its site must give notice to the FAA prior to beginning construction or alteration. 14 C.F.R. Part 77, Subpart B. Following prescribed standards, the FAA makes a determination that the proposed construction or alteration either does or does not constitute a hazard to air navigation. 14 C.F.R. § 77.35-.37.
 
 
 12
 The district court recognized that the FAA has limited authority to control the construction of broadcast towers. However, it concluded that if the FAA had determined that the Rhinelander tower would be a hazard to pilots the FCC would have considered this determination in making its decision whether to grant a broadcasting license to the tower's owner. Though the FCC has no power to prohibit the construction of a tower, the district court reasoned that denial of a broadcasting license "on the basis of the FAA hazard determination is in effect a denial of construction of the tower by the FCC." 448 F.Supp. at 455. Thus the court found that the FAA and FCC "acting in concert do have authority to indirectly ban the construction of such towers." Id. at 463.
 
 
 13
 The district court concluded that the FAA made its "no hazard" determination on the basis of an irrelevant criterion and thus "breached its duty of due care in its review of the hazard posed by the tower." Id. at 463-65. The "irrelevant criterion" was the FAA's conclusion that the tower would be very important in supplying television to the many residents and tourists in the area.
 
 
 14
 The FAA issued the following statement with regard to the Rhinelander tower:
 
 
 15
 Such a structure will be a definite hazard to non-IFR general aviation aircraft because of aviation activity in the area when ceiling and visibility are down. The real problem is when the pilot who becomes lost or confused which can happen so easily in the north woods (sic). However television is also very important to the many residents and tourists in the north that I feel it's worth the chance so long as it remains the only one to be approved. (Emphasis added.)
 
 
 16
 448 F.Supp. at 455.
 
 
 17
 The district court based its finding of negligence on this statement:
 
 
 18
 This statement admits that "such structure will be a definite hazard to non-IFR general aviation aircraft because of aviation activity in the area when ceiling and visibility are down." Yet the FAA went on to justify its decision by stating that "television is also very important to the many residents and tourists in the north." It is incredulous that the agency would base its determination of "no hazard to navigation" on the need for television in the north woods, while at the same time admitting the hazard which the obstruction presents. Clearly the FAA based its determination upon an irrelevant criterion. Nowhere is the FAA mandated to consider the need for television. Its primary duty is owed to the pilots and passengers of this country, especially in this instance to the private aircraft pilots whose interests were most seriously endangered by the construction of such a broadcast tower.
 
 
 19
 448 F.Supp. at 463.
 
 The court concluded:
 
 20
 The court recognizes that there are two other towers in Wisconsin similar in height to this one (finding of fact # 27). However, examination of aeronautical maps of Wisconsin indicates that towers of this height are unusual. Because of the great height of the tower, the guy-wires used to support it necessarily were located a great distance away from the tower. The fact that these wires were unmarked heightens the danger they present to small planes. The fact that the area is frequently used by small aircraft is a consideration. Weighing the testimony contained in the objections received by the FAA, the unusual height of the tower and the breadth of its supporting cables, this court concludes that the tower is a hazard to air navigation in the area, that this hazard was known to the FAA at the time of its determination, that nonetheless the corporation obtained permission for the tower to be built, and that an accident such as occurred to plaintiffs' decedents was foreseeable to the FAA as directly resulting from the agency's action.
 
 
 21
 448 F.Supp. at 465.
 
 B.
 
 22
 The other basis for government liability was found in the failure of the FAA and FCC to require lights or markings on the guy wires. The regulations in question, 47 C.F.R., Part 17, Subpart C, contain very specific lighting requirements for towers which reach 200 feet or more above the ground. The specifications for lighting of "antenna structures" between 1650 and 1800 feet in height are found at 47 C.F.R. § 17.35. The regulations provide that "(t)he term antenna structures includes the radiating and/or receiving system, its supporting structures and any appurtenances mounted thereon." 47 C.F.R. § 17.2(a). The plaintiffs contended that these regulations, taken together, explicitly required guy wires to be lighted or marked. The district court held that such a construction strained the meaning of the language of the regulations and that the regulations do not require lights or other markings on guy wires. However, noting the general statutory duty of the FAA to provide for the safety of aircraft, the district court concluded that the FAA was negligent in failing to require some lighting or marking. Apparently the district court believed the FAA should have promulgated such regulations since those of the FCC do not cover guy wires. See 448 F.Supp. at 467.
 
 C.
 
 23
 Though the government contends there was no proof of negligence on the part of the FAA or the FCC, its primary argument is that the district court lacked jurisdiction for a claim against the United States based on the agency actions in question. The jurisdictional argument is based on the "discretionary function" exception to government tort liability contained in the Federal Tort Claims Act:
 
 
 24
 The provisions of this chapter and section 1346(b) of this title shall not apply to-
 
 
 25
 (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
 
 
 26
 28 U.S.C. § 2680(a).
 
 
 27
 The district court found that the discretionary function defense is not applicable to this case.
 
 
 28
 With respect to the FAA's "no hazard" determination, the district court held that the FAA was not making policy but was merely implementing policy that had already been "determined and enunciated." 448 F.Supp. at 464. With respect to the lack of warning markers on the guy wires, the district court found that there was "no agency action at all" and "there must first be evidence of some exercise of discretion" before the discretionary function defense applies. 448 F.Supp. at 467-68.
 
 IV.
 
 29
 We begin our discussion of the discretionary function exception by examining the landmark decision in Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), where the Supreme Court dealt with the historical background and legislative history of this exception to the waiver of sovereign immunity from tort liability. In discussing the legislative history, Mr. Justice Reed, writing for the majority, referred to "the governmental regulatory function exception from suits." Id. at 26, 73 S.Ct. at 963 (emphasis supplied). This language appears to assume that regulatory activities involve discretion. The Court also quoted from a statement by an assistant attorney general testifying before the House Judiciary Committee when it was considering legislation which eventually became the Federal Tort Claims Act. This witness testified that the discretionary function exception was included because it was not "intended that the constitutionality of legislation, the legality of regulations, or the propriety of a discretionary administrative act, should be tested through the medium of a damage suit for tort." Id. at 27, 73 S.Ct. at 963.
 
 
 30
 In analyzing the two exceptions contained in § 2680(a), supra, the Court noted that the second exception applies to "acts of discretion in the performance of governmental functions or duty 'whether or not the discretion involved be abused.' " 346 U.S. at 33, 73 S.Ct. at 966. The reference to abuse, the Court found, "connotes both negligence and wrongful acts in the exercise of the discretion ...." Id. The Court further found that "discretionary function" includes more than high level decisions to initiate government programs and activities. "It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations." 346 U.S. at 35-36, 73 S.Ct. at 968. (footnote omitted). In denying jurisdiction in the particular case before it in Dalehite, the Court noted that the decisions upon which the district court had predicated liability "were all responsibly made at a planning rather than operational level ...." 346 U.S. at 42, 73 S.Ct. at 971.
 
 
 31
 Though Dalehite has been limited in other respects, see Rayonier, Inc. v. United States, 352 U.S. 315, 319-20, 77 S.Ct. 374, 376-377, 1 L.Ed.2d 354 (1957), its conclusions represented by the language quoted herein have not been questioned. However, the application of these principles to specific cases has created problems and some disparity in results.
 
 
 32
 In Miller v. United States, 583 F.2d 857 (6th Cir.1978), this court considered a tort claim against the government for flooding of plaintiffs' land caused by alleged negligence in the operation of flood gates at Sault Ste. Marie, Michigan. After considering Dalehite, the court concluded that the discretionary function exception does not immunize the government from liability based on the manner in which the gates were operated, mistakes in judgment as to the amount of water passing through the gates or for failure by the operators of the gates to observe regulations governing their activities. However, the exception was found to insulate the government from tort liability "for deliberate official decisions and directives requiring lake levels to be maintained within a specific range." 583 F.2d at 867.
 
 
 33
 In Downs v. United States, 522 F.2d 990 (6th Cir.1975), this court rejected the government's contention that an action was barred by the discretionary function exception. In that case two hostages in a hijacked airplane were killed when FBI agents attempted to prevent the plane from taking off after being urged by the pilot not to interfere. The court considered the purpose of the exception as disclosed by the language itself, the legislative history and judicial interpretations, and concluded that decisions in handling a particular law enforcement problem do not involve the discretionary function which Congress referred to in the Act. Such decisions have no "policy overtones." 522 F.2d at 997. In reaching this conclusion the court observed, "Congressional reports indicate that the regulatory functions of the FTC and SEC were the types of activity to be exempted by this exception." Id. at 996 (footnote omitted).
 
 
 34
 Our per curiam opinion in Miller v. United States, 522 F.2d 386 (6th Cir.1975), disposed of an argument similar to the plaintiffs' contention in the present case that the FAA and FCC should have required markers on guy wires with the following statement:
 
 
 35
 Nor do we find any error in the district court's conclusion that the United States should not be subjected to liability in this case because air safety regulations should have been more strict at the Cincinnati airport. The discretionary function exception to the Federal Tort Claims Act precludes the imposition of tort liability on the claimed failure to impose a more strict set of air safety regulations. 28 U.S.C. § 2680, Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).
 
 
 36
 522 F.2d at 387.
 
 
 37
 It appears that this court has consistently held that the discretionary function exception does not apply to day-to-day decisions made by government employees in the field, Downs, supra; and Miller, 583 F.2d 857, supra; but does bar liability based on "deliberate official decisions and directives," Miller, 583 F.2d 857, supra; failure of a regulatory agency to meet particular requirements desired by a member of the public when the desired action is not explicitly required by statute or regulation, Miller, 522 F.2d 386, supra; and decisions generally which have "policy overtones." Downs, supra. These decisions appear faithful to the language and purpose of the Act and to its interpretation by the Supreme Court.
 
 
 38
 Decisions from other courts, while emphasizing various factors in particular cases, appear generally to have followed a course similar to that of this circuit. A number of cases have denied the defense of discretionary function where air traffic controllers have acted negligently in advising pilots. E. g., Ingham v. Eastern Air Lines, Inc., 373 F.2d 227 (2d Cir.), cert. denied, 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967). Such cases deny the exemption where the negligent decision is made in an operational setting rather than in a context of official planning or policymaking. See Smith v. United States, 546 F.2d 872 (10th Cir.1976); Driscoll v. United States, 525 F.2d 136 (9th Cir.1975); Seaboard Coast Line R.R. Co. v. United States, 473 F.2d 714 (5th Cir.1973); Pigott v. United States, 451 F.2d 574 (5th Cir.1971).
 
 
 39
 In cases where the distinction between operational and planning or policy decisions is not clear the courts have nevertheless found a line of demarcation between activities which involve discretionary functions and those that do not. In Griffin v. United States, 500 F.2d 1059 (3d Cir.1974), the court emphasized that the only thing challenged was the way in which a regulation was implemented. While implementation involved the exercise of judgment, it was the judgment of a professional measuring a particular medical effect of laboratory activities, "not that of a policy-maker promulgating regulations by balancing competing policy considerations in determining the public interest." 500 F.2d at 1066. The court found that the regulation in question was detailed in specifications and contained a strict requirement as to the amount of "neurovirulence" permitted in a batch of live polio vaccine released by a government agency. In this situation the agency had no discretion "to disregard the mandatory regulatory command," and violation of a nondiscretionary command removed the action from the scope of the statutory exception. 500 F.2d at 1068-69.
 
 
 40
 The Tenth Circuit stated the test for application of the discretionary function exception in Barton v. United States, 609 F.2d 977, 979 (10th Cir.1979), as follows:
 
 
 41
 Concisely stated, the rule is that if a government official in performing his statutory duties must act without reliance upon a fixed or readily ascertainable standard, the decision he makes is discretionary and within the exception of the Tort Claims Act. Conversely, if there is a standard by which his action is measured, it is not within the exception. The statute provides that if the act of the official is discretionary it is not actionable even though the discretion is abused.
 
 V.
 A.
 
 42
 As the court pointed out in First National Bank in Albuquerque v. United States, 552 F.2d 370, 375 (10th Cir.), cert. denied, 434 U.S. 835, 98 S.Ct. 122, 54 L.Ed.2d 96 (1977), it is necessary to focus on the statutes and regulations involved in a particular case in order to determine whether the discretionary function exception applies. The specific statute dealing with structures which may constitute hazards to air commerce is 49 U.S.C. § 1501:
 
 
 43
 § 1501. Hazards to air commerceThe (Secretary of Transportation) shall, by rules and regulations, or by order where necessary, require all persons to give adequate public notice, in the form and manner prescribed by the (Secretary of Transportation), of the construction or alteration, or of the proposed construction or alteration, of any structure where notice will promote safety in air commerce.
 
 
 44
 A more general statutory command is contained in 49 U.S.C. § 1348(a):
 
 
 45
 § 1348. Airspace control and facilities
 
 
 46
 (a) Use of airspace
 
 
 47
 The (Secretary of Transportation) is authorized and directed to develop plans for and formulate policy with respect to the use of the navigable airspace; and assign by rule, regulation, or order the use of the navigable airspace under such terms, conditions, and limitations as he may deem necessary in order to insure the safety of aircraft and the efficient utilization of such airspace. He may modify or revoke such assignment when required in the public interest.[3]
 
 
 48
 Both of these statutes speak in general, not specific terms. The same is true of the regulations related to determination of whether a proposed structure would be a hazard to air navigation. The FAA regulations require consideration of "all facts relevant to the effect of the proposed construction or alteration on the safe and efficient utilization of the navigable airspace." 14 C.F.R. § 77.35(b)(4). These regulations are replete with permissive words in describing the functions of FAA officials. E. g., "This study may include ....." "To the extent considered necessary ....." Id. (a), (b). This language connotes discretion rather than mandatory requirements. Like those considered by the court in First National Bank in Albuquerque, supra, the statutes and regulations upon which governmental action was based in the present case are written in terms of general policy standards rather than specific mandatory directions.
 
 B.
 
 49
 The district court recognized that § 2680(a) precludes a finding of government liability on the basis of an abuse of discretion.[4] Nevertheless, the process by which it reached its conclusion that the government was liable for the FAA's issuance of the "no hazard" determination appears to have involved a determination that the agency did abuse its discretion rather than a determination that the agency exercised no discretion.[5]
 
 
 50
 It is clear to us that the FAA performed a discretionary function in making a "no hazard" determination with respect to the TV tower. Contrary to the finding of the district court, the FAA was permitted to consider matters other than safety of aircraft. To the extent considered necessary, the regional director is authorized by 14 C.F.R. § 77.35 to consider "all facts relevant to the effect of the proposed construction or alteration on the safe and efficient utilization of the navigable airspace." (emphasis added). Further, 14 C.F.R. § 77.31 requires the consideration of "conflicting demands." The comment which the FAA made concerning the importance of television to the Wisconsin north woods country convinced the district court that the agency based its determination on an "irrelevant criterion." 448 F.Supp. at 463. On the contrary, this statement indicates a consideration of competing demands and the exercise of the broad discretion granted to the agency.
 
 
 51
 The conclusion of the district court with respect to failure to mark guy wires is even less tenable. The responsibility of the FAA with respect to the safety of aircraft is "to develop plans for and formulate policy with respect to the use of navigable airspace; and assign by rule, regulation, or order the use of the navigable airspace under such terms, conditions, and limitations as he may deem necessary ...." 49 U.S.C. § 1348(a) (emphasis added). The italicized words all denote discretionary function, not specific mandatory actions. Assuming it was negligent not to require markings on guy wires, at most the failure to require them would be "the failure to exercise or perform a discretionary function or duty ...." See 28 U.S.C. § 2680(a). Such a failure may not be the basis of an action against the United States for damages.
 
 
 52
 The district court erred as a matter of law in finding the government liable for alleged negligence of the FAA and FCC based on the issuance of the no-hazard determination and the failure to require lights or other markings on the guy wires. The affirmance of the district court's judgment is based solely on the finding that the government was negligent in publishing an aeronautical chart with a 1720-foot obstruction erroneously located.
 
 
 53
 The judgment of the district court is affirmed. No costs are allowed on appeal.
 
 
 
 [1]
 28 U.S.C. §§ 1346(b), 2671 et seq
 
 
 [2]
 49 U.S.C. § 1348(b) authorizes, but does not require, the publication of such charts
 
 
 [3]
 The Department of Transportation was created by Pub.L. 89-670, October 15, 1966, 80 Stat. 931, which also transferred to the Secretary of Transportation all functions, powers, and duties of the former Federal Aviation Agency and its administrator. The former Federal Aviation Agency became the Federal Aviation Administration within the new department
 
 
 [4]
 Of course, agency action may be reviewed for abuse of discretion pursuant to the Administrative Procedure Act, 5 U.S.C. § 551 et seq
 
 
 [5]
 The district court was particularly incensed that a congressman who owned the broadcast company which applied for the determination attempted to influence the FAA by writing on his official stationery and reminding the agency that he had supported it for many years. While these facts reflect on the independence of this regulatory agency and may indicate an abuse of discretion, they do not render the discretionary function exemption inapplicable