LIMAR SHIPPING LTD. and OMI Corp., Plaintiffs,

v.

The UNITED STATES of America, Defendant.

No. 98–CV–10410–MEL.

United States District Court, D. Massachusetts.

Feb. 28, 2002.

Thomas J. Muzyka, Clinton & Muzyka, Boston, MA, for Plaintiffs.

Michelle T. Delemarre, U.S. Dept. of Justice, Torts Branch, Civil Division, Washington, DC, Thomas E. Kanwit, United States Attorney's Office, Boston, MA, for Defendants.

*MEMORANDUM AND ORDER*

LASKER, District Judge.

Limar Shipping Ltd. ("Limar"), the owner of the *M/T Limar,* and OMI Corp.,

the operator of the *M/T Limar*, bring this action against the United States seeking damages resulting from the grounding of the *M/T Limar* while relying on an allegedly erroneous nautical chart made by the United States. The *M/T Limar* scraped its hull on the bottom of Boston Harbor while headed to port in Chelsea, Massachusetts. Limar and OMI allege that the United States breached applicable survey standards (Count I), negligently conducted the survey (Count II), negligently produced and sold the relevant nautical chart (Count III), breached both an implied and express warranty when selling the chart relied on by the *M/T Limar* (Counts IV and V), and is liable under strict product liability (Count VI).

The United States moves for summary judgment. The motion is granted and the complaint is dismissed.

### I.

On the morning of March 11, 1996, the steel hulled tanker vessel *M/T Limar*, owned by Limar and operated by OMI, approached Boston, Massachusetts. The ship's destination was a berth at the Atlantic Terminal in Chelsea, Massachusetts, where it was to deliver a split cargo of heating oil and jet fuel. The *M/T Limar* stretched over 545 feet long and had a beam of about 90 feet.

As a matter of safety, Massachusetts law requires foreign vessels the size of the *M/T Limar* to employ a harbor pilot when entering Boston Harbor. *See* M.G.L. ch. 103, §§ 21, 28. In compliance with this rule, the *M/T Limar* took aboard a compulsory harbor pilot, Lawrence Cannon, at 7:22 a.m. Cannon, as the harbor pilot, took control of the ship to navigate it through the shipping channel in Boston Harbor.

The main shipping route in Boston Harbor contains both an inbound and outbound channel, which are side by side.

These channels are maintained by the Army Corps of Engineers ("Army Corps"). Congress allocates funds to maintain Federal channels at certain authorized depths and widths. In 1996, the Boston Harbor inbound channel was authorized to be dredged to a depth of 35 feet below Mean Low Water, and the outbound channel was authorized to be kept at a depth no more than 40 feet. Both of these channels could be maintained up to 600 feet wide.

The two channels were in turn split lengthwise into four equal strips, known as quarters. For the inbound channel, these were fittingly named the Left Outside Quarter ("LOQ"), the Left Inside Quarter ("LIQ"), the Right Inside Quarter ("RIQ"), and the Right Outside Quarter ("ROQ"). Left and right are determined from the perspective of a vessel traveling inbound; accordingly, the ROQ is the northernmost quarter of the inbound channel, while the LOQ is the southernmost quarter.

The Army Corps conducts periodic surveys of the shipping channel quarters to determine their actual depths, as opposed to the authorized depths, as well as to discover unexpected debris or shoaling. The results of these surveys are made known to the public through *Results of Survey Reports* and Coast Guard *Local Notice to Mariners* publications. Relevant to this matter, the last periodic survey of the disputed area of the inbound channel was completed in 1990. The results of the 1990 Boston Harbor survey appeared in a *Results of Survey Report* dated July 23, 1990, and they were published in the First Coast Guard District's *Local Notice to Mariners*, Number 31, on August 1, 1990. They also appeared in a book entitled *The Port of Boston, Massachusetts, Port Series No. 3*, issued in 1994. In each of these sources, the 1990 survey reported the controlling depth, which is the shallowest point at any place as compared to Mean

Low Water, for each quarter of the inbound channel to be: 33.9 feet for both the LOQ and LIQ (approximately 33 feet, 11 inches), 32.5 feet for the RIQ (32 feet, six inches), and 32.1 feet for the ROQ (approximately 32 feet, one inch).

Cannon, a harbor pilot for 24 years in 1996, knew these survey results, and did not bring a nautical chart with him. Although he had never been aboard the *M/T Limar*, he familiarized himself with the ship, and asked the *M/T Limar*'s crew for the draft of the ship. It is unclear whether the crew incorrectly told Cannon the draft was 33 feet, four inches, or Cannon later incorrectly recalled that the crew told him that figure; in fact, the *M/T Limar*'s draft was 33 feet, nine inches at the time. Cannon then directed the ship through the Boston Harbor.

While Cannon piloted the vessel, the *M/T Limar*'s crew observed the movement of the ship. Third Mate Rodolfo Arcilla took periodic position fixes of the vessel's location and plotted them on the *M/T Limar*'s copy of Nautical Chart 13272, 43rd Edition, dated June 28, 1995. The National Oceanic and Atmospheric Administration ("NOAA") created this chart using information from several sources, including the 1990 Army Corps survey.

At 8:50 a.m., the *M/T Limar* scraped the Boston Harbor floor near Red Nun Buoy No. 8, at approximately 42 20.494' N and 71 00.505' W. The parties agree that this location is on the right half of the inbound channel, but disagree as to whether it is in the RIQ or the ROQ. There was no other traffic in the channel that required Cannon to take the particular route he did within the inbound channel. The vessel grounded on the starboard (right) side forebody, but was not damaged so severely that it could not continue on to its berth. However, the damage to the hull and the resulting steps taken to prevent oil pollution is alleged to have cost Limar and OMI in excess of $800,000.

Cannon was subsequently brought before the Massachusetts Pilot Commission, which found that he had been "careless, and his carelessness was the cause of the groundings." Cannon was suspended for two months.

## II.

The United States moves for summary judgment on two grounds: (1) the United States has not waived its sovereign immunity; and (2) the grounding of the *M/T Limar* was solely caused by the harbor pilot's negligence and the negligence of the ship's crew.

### A. The Discretionary Function Exception to the United States' Waiver of Sovereign Immunity

#### 1. Does a Discretionary Function Exception Exist in this Matter?

 The United States views the claims against it as a negligence tort brought under the Suits in Admiralty Act, 46 App. U.S.C.A. §§ 741–52, and the Public Vessels Act, 46 App.U.S.C.A. §§ 781–90. It argues that although these two statutes do waive the sovereign immunity of the United States, the waiver is limited by an implied discretionary function exception, similar to the express version of the exception in the Federal Tort Claims Act ("FTCA"). *See* 28 U.S.C. § 2680(a). The government relies on *Gercey v. United States*, 540 F.2d 536 (1st Cir.1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977), to support the existence of an implied discretionary function exception. In *Gercey*, the Court of Appeals for the First Circuit held that:

[u]nlike the Federal Tort Claims Act, the Suits in Admiralty Act does not contain an express exception for harm caused by the exercise of "discretionary functions", a category which includes, and probably should be limited to, basic "policy judgments as to the public interest". Although the Suits in Admiralty Act contains no express exception, we think that sound principles demand that the act be construed as subject to such discretionary function exception. Were there no such immunity for basic policy making decisions, all administrative and legislative decisions concerning the public interest in maritime matters would be subject to independent judicial review in the not unlikely event that the implementation of those policy judgments were to cause private injuries. That, in our view, would be an intolerable state of affairs, and we decline, in the absence of an express Congressional directive to the contrary, to construe this waiver of sovereign immunity as providing the federal courts with that power.

*Gercey,* 540 F.2d at 539 (citations and footnote omitted).

Limar and OMI respond that the Fourth Circuit has properly refused to imply the discretionary function exception on the ground that it should be left to Congress to amend the statute if the waiver of sovereign immunity is too extensive. *Lane v. United States,* 529 F.2d 175, 179 (4th Cir. 1975). However, Limar and OMI admit that the weight of authority supports the existence of an implied discretionary function exception.

As Limar and OMI appear to concede, an implied discretionary function exception exists in this matter because *Gercey* controls the First Circuit. Most other Courts of Appeal agree. *See, e.g., In re Joint Eastern and Southern Districts Asbestos Litigation,* 891 F.2d 31, 35 (2nd Cir.1989);

*Wiggins v. United States,* 799 F.2d 962, 965–66 (5th Cir.1986); *Gemp v. United States,* 684 F.2d 404, 408 (6th Cir.1982); *Bearce v. United States,* 614 F.2d 556, 559–60 (7th Cir.), *cert. denied,* 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44, *rehr'g denied,* 449 U.S. 1026, 101 S.Ct. 595, 66 L.Ed.2d 488 (1980); *Williams By and Through Sharpley v. United States,* 581 F.Supp. 847, 852 (S.D.Ga.1983), *aff'd on opinion below,* 747 F.2d 700 (11th Cir. 1984); *Canadian Transp. Co. v. United States,* 663 F.2d 1081, 1085–87 (D.C.Cir. 1980).

### 2. If an Exception Does Exist, are the United States' Actions Within it?

#### a. Surveying

The United States argues that it does not ensure the safe navigation of any waterway, especially given the limited resources available to allocate to the Coast Guard and the Army Corps. *See, e.g., Eklof Marine Corp. v. United States,* 762 F.2d 200, 202 (2nd Cir.1985); *United States Fire Ins. Co. v. United States,* 806 F.2d 1529, 1537–38 (11th Cir.1986); *Canadian Pac. (Bermuda) Ltd. v. United States,* 534 F.2d 1165, *rehr'g denied,* 539 F.2d 710 (5th Cir.1976). There is similar authority for the proposition that the frequency, times, or locations of surveying or dredging is a discretionary activity. *See, e.g., Canadian Pac.,* 534 F.2d at 1169–71 (surveying and dredging); *Boston Edison Co. v. Great Lakes Dredge & Dock Co.,* 423 F.2d 891, 896–97 (1st Cir.1970) (dredging).

Limar and OMI respond that they are not suing on the theory of failure to survey or dredge, but instead on the theory that the Army Corps failed to follow its own regulations in the *Army Corps Hydrographic Surveying Manual* when surveying Boston Harbor. They assert that the *Army Corps Hydrographic Surveying Manual* refers to guidelines established by

the NOAA in the *NOAA Hydrographic Manual* for surveys such as the one the Army Corps undertook in Boston Harbor. Accordingly, Limar and OMI contend that even though the NOAA survey guidelines were mandatory, the Army Corps failed to follow them. To support their argument, Limar and OMI turn to the two-step test that the Supreme Court has outlined to determine whether the exception applies under the FTCA [1]:

> In examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the acting employee. This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice. Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect.
>
> [Second], assuming the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield. The basis for the discretionary function exception was Congress' desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Varig Airlines*, 467 U.S. 797,

814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy. In sum, the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment.

*Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536–37, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) (some citations omitted).

Limar and OMI assert that the NOAA regulations are mandatory because the *Army Corps Hydrographic Surveying Manual* refers to them for use in making nautical charts. They argue that because the Army Corps failed to follow the mandatory survey techniques in the *NOAA Hydrographic Manual*, the first half of the discretionary function exception test is not met. Without the first half of the test, Limar and OMI contend that the discretionary function exception does not apply, the United States has waived sovereign immunity, and therefore it is amenable to suit.

Limar and OMI rely in particular on *In re Glacier Bay*, 71 F.3d 1447 (9th Cir. 1995), in which an oil tanker ran aground on a rock omitted from the relevant nautical chart. The Ninth Circuit held that the discretionary function exception did not apply because the nautical chart had been prepared based on a survey that did not comply with the NOAA manual's requirements: "decisions involving the application of objective scientific standards ... are not insulated by the discretionary function

---

1. The First Circuit has not defined the scope of the implied discretionary function exception as it exists in the Suits in Admiralty Act and the Public Vessels Act. The parties do not dispute that if such an exception exists, as has been determined above, it should be construed in the same way as the exception in the FTCA.

exemption because they do not involve the weighing of economic, political and social policy." *In re Glacier Bay*, 71 F.3d at 1453 (citation omitted).

The United States responds by stating that the particular NOAA guidelines outlined by Limar and OMI are not binding on the Army Corps, which has its own set of regulations that it must follow (and which are less stringent than the NOAA survey guidelines). It argues that the Army Corps should not be subjected to the NOAA survey guidelines. Moreover, the United States argues that *In re Glacier Bay* is distinguishable because it involved a survey prepared by NOAA itself, which must follow its own guidelines, not the Army Corps, which is the organization that prepared the Boston Harbor survey. The United States asserts that Limar and OMI have produced no evidence that Army Corps employees must follow the NOAA survey guidelines.

The United States also contends that *In re Glacier Bay* is against the weight of authority on the issue of whether to evaluate the conduct of each individual government employee. The United States relies on *United States v. Gaubert*, 499 U.S. 315, 324, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), for the proposition that a court should not overly parse governmental decision-making: "[w]hen established governmental policy ... allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when he exercises that discretion." Accordingly, the government concludes that the Army Corps has discretion over how and when to conduct its surveys and is not required to apply the NOAA survey guidelines that Limar and OMI argue are mandatory.

Resolving this dispute is complicated by the fact that the parties' arguments are in some respects like two ships passing in the night. The United States makes the blanket assertion that the actions of both the Army Corps and NOAA are covered by discretionary function exception and focuses its initial brief largely on the issue of surveying, while Limar and OMI differentiate between the various actions taken by the two agencies and have alleged negligence beyond · the surveying of Boston Harbor. This discrepancy requires parsing.

First, as to the issue of whether the Army Corps was required to survey the Boston Harbor using the NOAA guidelines, it plainly was not. The language in the *Army Corps Hydrographic Surveying Manual* is not ambiguous. On the one hand, it says that the Army Corps manual "shall be used as a guide in planning and performing hydrographic surveys with [Army Corps] hired-labor forces." *Army Corps Hydrographic Surveying Manual* at 1–1. On the other hand, it provides:

> This manual is intended to cover only those engineering and construction survey activities which support typical [Army Corps] river, harbor, harbor approach channel, or inland waterway projects .... [it] does not cover classical hydrographic surveying functions which are more traditionally associated with the preparation of nautical charts. These procedures are detailed in the [*NOAA Hydrographic Manual.*]

*Army Corps Hydrographic Surveying Manual* at 1–1. The purpose for which a survey is undertaken determines which of these two clauses applies.

In this case, the parties agree that the 1990 Boston Harbor survey, which formed the basis of the relevant part of the chart in dispute here, was a "periodic" or "condition survey." Dep. of Carl Boutilier at 8–10; 28. A periodic or condition survey is initiated by the Army Corps as part of its normal maintenance of Federal harbors

and channels. Dec. of Carl Boutilier ¶¶ 6–8. It is true that the results of these surveys are disseminated to the public through *Results of Survey Reports* and Coast Guard *Local Notice to Mariners* publications, but they are not released as a completed nautical chart. Dec. of Boutilier ¶¶ 7–12. Here, the results of the 1990 Boston Harbor survey appeared in a *Results of Survey Report* dated July 23, 1990, and were published in the First Coast Guard District's *Local Notice to Mariners,* Number 31, on August 1, 1990. Both documents revealed the controlling depths at Mean Low Water for the four quarters of the authorized 35 foot channel in tabular, rather than in graphical, form.

These facts make clear that the Army Corps was conducting "engineering and construction survey activities which support typical [Army Corps] river, harbor, harbor approach channel, or inland waterway projects ...." *Army Corps Hydrographic Surveying Manual* at 1–1. Even though the results of the survey were later incorporated into Nautical Chart 13272, the Army Corps was not undertaking "classical hydrographic surveying functions which are more traditionally associated with the preparation of nautical charts." *Army Corps Hydrographic Surveying Manual* at 1–1. Accordingly, the Army Corps properly followed the guidelines in its own manual and was not required to employ the more rigorous methods described in the *NOAA Hydrographic Manual.*

This determination, however, does not send the entire case to Davy Jones' locker, as the United States would have it. It does mean that Count I, which alleges that the United States breached applicable survey standards, and Count II, which alleges that the United States negligently conducted the survey, fail, and summary judgment shall enter for the United States as

to these two counts. But the remaining counts (III–VI), which focus on the production and sale of the nautical chart, are not precluded by the manner in which the Army Corps conducted the condition survey of Boston Harbor.

### b. *Production of Nautical Chart 13272*

█ Counts III–VI allege negligence on the part of the United States in preparing, publishing, distributing, and/or selling navigational charts, and breaching the warranties attendant to selling a product. In contrast to the breadth of these claims, the facts that Limar and OMI pleaded are restricted to an allegation that the United States made and sold an incorrect chart. NOAA, not the Army Corps, produced the chart in question. Limar and OMI argue that had a better survey been performed, that is, under the standards outlined in the *NOAA Hydrographic Manual,* the United States would have met its alleged duty of care in producing the chart. The United States responds that producing Nautical Chart 13272 was a discretionary function, and that it is therefore entitled to sovereign immunity.

The result of this winnowing analysis then is a question of law: was NOAA's decision to use surveys of a lower standard than its own to produce a nautical chart of Boston Harbor discretionary? This question proves to be a knot which could stymie even a sailor.

On the one hand, as Limar and OMI argue, although it was certainly a discretionary decision on the part of NOAA to produce the chart at all, *see* 33 U.S.C. § 833(a)-(b), once NOAA made the decision to make the chart, NOAA may have accepted a duty of care to make it accurately. Cases such as *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), and *Reminga v. Unit-*

ed States, 631 F.2d 449 (6th Cir.1980), support this position.

In *Indian Towing,* the Supreme Court held the government could be liable for the negligent operation of a lighthouse:

> The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act.

*Indian Towing,* 350 U.S. at 69, 76 S.Ct. 122.

In *Reminga,* the executrices of two airplane passengers who were killed when their plane hit a cable supporting a television tower sued the United States because the relevant aeronautical chart placed the tower in the wrong location. The Sixth Circuit held "[t]hough not required by law to do so, when the [Federal Aviation Administration] arranges for the publication of aeronautical navigation charts and engenders reliance on them, it is required to use due care to see that they accurately depict what they purport to show." *Reminga,* 631 F.2d at 452 (footnote omitted). Accordingly, the Sixth Circuit held that the discretionary function exception in the FTCA did not apply and the suit could go forward against the United States.

On the other hand, as the United States argues, a decision regarding how much detail to include in a nautical chart could be seen as exactly the type of discretionary executive determination that courts are unwilling to review. A precedent in favor of this approach is *Baird v. United States,* 653 F.2d 437 (10th Cir.1981), *cert. denied,* 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982), in which the length of an airport's longest runway marked on an aeronautical chart was not linked to whether that runway was lighted at night. This failure to link the information resulted in pilot confusion and an airplane crash. In *Baird,* the Tenth Circuit reviewed *Indian Towing, Reminga,* and other similar cases, and concluded that the discretionary function exception to the FTCA did apply to a challenge to an aeronautical chart for being "too sketchy." *Baird,* 653 F.2d at 441. In explaining its rationale, the Tenth Circuit stated that the plaintiffs' "challenge thus goes to the heart of the [governmental cartographer's] deliberative and judgmental activities in designing and approving the extent of detail to be included in aeronautical sectional charts versus the extent of detail left to be gleaned from other sources that the prudent pilot can be expected to consult." *Baird,* 653 F.2d at 441.

In light of this relevant case law, I conclude that NOAA's decision to use surveys of a lower standard than its own to produce a nautical chart of Boston Harbor was a discretionary decision. As discussed above in the surveying context, *Berkovitz,* 486 U.S. at 531, 108 S.Ct. 1954, is the standard by which such a determination is measured.

The first question is "whether the action is a matter of choice for the acting employee .... conduct cannot be discretionary unless it involves an element of judgment or choice." *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954. There is no regulation requiring NOAA to use only its own surveys to create nautical charts. Therefore, Limar's and OMI's argument, based on *Berkovitz,* that "the discretionary function exception

will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," is inapposite here. *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954. Indeed, it would be surprising to find such a rule, given the limited resources of NOAA and the innate difficulties in charting the ever-changing ocean bottom. Instead, it is the job of NOAA cartographers and officials to weigh the benefits against the costs of conducting its own surveys, which are undisputedly more accurate than many other surveys, and using the surveys conducted by other organizations. In this case, NOAA determined it was appropriate to use various surveys in constructing the chart for Boston Harbor, and printed on the chart itself a "Source Diagram" that listed which survey data led to which depth markings on the chart. Its decision was clearly discretionary.

The next step of analysis asks, "assuming the challenged conduct involves an element of judgment, ... whether that judgment is of the kind that the discretionary function exception was designed to shield .... The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy." *Berkovitz*, 486 U.S. at 537, 108 S.Ct. 1954. Deciding how to allocate scare resources and how to best issue charts of shipping channels throughout the entire United States is a public policy matter. Accordingly, the discretionary function exception to the United States' waiver of sovereign immunity applies to Counts III–VI of the Complaint.

The *Reminga* Court's holding that once a governmental body decides to make a navigational chart, it must do so in a non-negligent manner, has common-sense appeal. The critical difference between *Reminga* and the case at hand is the level of generality that is used to frame the issue.

If, on the one hand, the question is framed broadly, "can the United States ever be liable for negligently producing a nautical chart of Boston Harbor?," then the answer may well be yes, since once the government voluntarily assumes a duty and induces reliance on its actions, it may not do so negligently. *Reminga*, 631 F.2d at 452; *see, e.g., In re Glacier Bay*, 71 F.3d at 1447. But if the question is framed narrowly as "was NOAA's decision to use surveys of a lower standard than its own to produce a nautical chart of Boston Harbor discretionary?," then the answer, as described above, is also yes. The narrow question is the correct one to ask because it is what the Complaint alleges and the evidence supports.

Counts III–VI are dismissed.

### B. Negligence of the Pilot and Crew

█ As an alternative argument, the United States contends it should be granted summary judgment because the negligence of the ship's crew and particularly the harbor pilot led to the *M/T Limar*'s grounding, not any actions taken by the United States. Limar and OMI respond that summary judgment can rarely be granted in a negligence action, and that the negligence of a compulsory harbor pilot is not attributable to the owners of the ship. *See, e.g., Homer Ramsdell Transp. Co. v. La Compagnie Generale Transatlantique*, 182 U.S. 406, 411, 21 S.Ct. 831, 45 L.Ed. 1155 (1901) (applying common law rule that "no action can be maintained against the owner of a vessel for the fault of a compulsory pilot" in context of New York State statute requiring compulsory pilot). They contend that there is no evidence that the pilot was acting in any abnormal way that would have notified the crew that he was placing the ship in danger.

Although the United States is entitled to dismissal of the complaint on grounds of sovereign immunity, it nevertheless cannot be said that the United States has ruled out Nautical Chart 13272 as the proximate cause of the grounding, at least in part. It is undisputed that the crew of the *M/T Limar* was following the movements of the ship while the harbor pilot steered the ship toward its berth in Chelsea, Massachusetts. Third mate Rodolfo Arcilla, at the least, was taking periodic position fixes by means of global position system, radar, and visual fixes, and plotting the positions on Nautical Chart 13272. Pls.' Opp'n to Def.'s Mot. for Summ. J., Ex. D ¶ 8 (Aff. of Mohan Muppidi). Accordingly, there remains a question of material fact as to whether an incorrect chart made and sold by NOAA prevented the *M/T Limar*'s crew from accurately monitoring the harbor pilot and telling him that he had entered dangerous waters. *Avondale Indus., Inc. v. International Marine Carriers, Inc.*, 15 F.3d 489, 493, *rehr'g denied*, 1994 U.S.App. LEXIS 8707 (5th Cir.1994) (holding crew retains ultimate responsibility for the ship and must act when manifest that the pilot is steering the ship into danger). Sorting out this possibility is precisely the type of determination reserved for a finder of fact, and the existence of a question of material fact bars a grant of summary judgment as to allegations of negligence.

### III.

As discussed above, the United States' motion for summary judgment is granted on the grounds of sovereign immunity. The complaint is dismissed.

It is so ordered.