John BRENEMAN and William
D. Breneman, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 02–1854 L.

United States Court of Federal Claims.

Aug. 6, 2003.

William D. Breneman, Alexandria, VA, for plaintiffs.

Kristine S. Tardiff, Concord, NH, with whom was Thomas L. Sansonetti, Assistant Attorney General, Environment & Natural Resources Division, U.S. Department of Justice, Washington, DC, for defendant. Anita Johnson, Boston, MA, and Robert Ernest, Burlington, MA, of counsel.

## OPINION AND ORDER

HEWITT, Judge.

This case is before the court on defendant's motion to dismiss for lack of subject

matter jurisdiction or, in the alternative, failure to state a claim. Plaintiffs seek compensation for defendant's physical taking and imposition of a servitude upon plaintiffs' property through the publication of an aeronautical chart and the issuance of two hazard determinations by the United States acting through the Federal Aviation Administration (FAA or defendant), an administration within the Department of Transportation. *See* Complaint (Compl.) ¶ 4 [1]; 49 U.S.C. § 106(a) (2003).

## I. Background [2]

Plaintiffs' property is located in the towns of New Braintree and Barre in central Massachusetts. Compl. ¶ 10. The property has been owned by plaintiffs' family since 1933. *Id.* ¶ 11. The portion of plaintiffs' property that is situated in New Braintree is now adjacent to the Tanner Hiller (formerly Hiller) Airport (Airport). Compl. ¶¶ 10, 12. The Airport, initially developed in or around 1950, is a single runway public use airport listed in the Airport Directory of the current Airman's Information Manual published by FAA. Compl. ¶¶ 9, 12; *see also* 14 C.F.R. § 77.2 (1971) (defining a public use airport as an airport that is open to the general public with or without a prior request to use the airport). Both the Airport and plaintiffs' property are, for the most part, undeveloped. Def.'s Ex. 5 (*Breneman v. Wolfson,* No. WCV 922705, 1999 WL 1203920, at *1 (Mass.Super.Ct. Oct. 21, 1999) (*Wolfson*)).

For some forty years, plaintiffs' property and the Airport existed side by side separated by a boundary fence (the fence) approximately 350 feet beyond one end of the runway on the edge of plaintiffs' property. Compl. ¶ 12. A hill (the hill) on plaintiffs' property was behind the fence. *Id.* Then, at a date prior to August 1991, the Airport caused the removal of trees, the hill, and the fence on plaintiffs' property in order to ex-

tend the runway to a point closer to the boundary with plaintiffs' property. *Id.* ¶ 13; *see also* Def.'s Ex. 5 (*Wolfson,* 1999 WL 1203920, at *1). The Airport extended the runway approximately 200 feet. Compl. ¶ 11; Def.'s Mot. at 4. The runway currently ends about 150 feet from the edge of plaintiffs' property. *Id.*

After plaintiffs discovered the alterations to their property in August, 1991, they brought suit in the Superior Court of Massachusetts against the Airport and its contractor for trespass, conversion, the wrongful removal of trees, and for unfair or deceptive business practices. Def.'s Mot. at 3; Def.'s Ex. 5 (*Wolfson,* 1999 WL 1203920, at *1) (suit against Airport); Def.'s Ex. 6 (*Breneman v. Tanner,* No. 922705, 1999 WL 1336436, at *1 (Mass.Super.Ct. Feb. 1, 1999) (*Tanner*) (suit against contractor)). The Superior Court found that the extension of the runway complained of by plaintiffs "was completed by September 1988" and that the runway "was in use by the end of 1988." Def.'s Mot. at 3; *Tanner,* 1999 WL 1336436, at *1–*2. The court granted motions for summary judgment filed by both the Airport and its contractor, holding that plaintiffs' claims were barred by the applicable statute of limitations or, alternatively, that they were precluded by a state statute of repose. Def.'s Mot. at 3; Def.'s Ex. 6 (*Tanner,* 1999 WL 1336436, at *2–*3) (granting contractor's motion to dismiss); Def.'s Ex. 5 (*Wolfson,* 1999 WL 1203920, at *3–*5) (granting Airport's motion for summary judgment as to all of plaintiffs' claims, but denying Airport's motion for summary judgment on its adverse possession claim). Plaintiffs state that they are currently pursuing appeals from these adverse judgments. Compl. ¶ 16.

In or about December 1997, plaintiffs discovered and reported to FAA a discrepancy between the runway length as reported in the Airport Directory of the then current

---

1. The court has before it Defendant's Motion to Dismiss (Def.'s Mot.); Defendant's Appendix of Exhibits to its Motion to Dismiss (Def.'s Ex.); Plaintiffs['] Opposition to Defendant's Motion to Dismiss (Pls.' Opp.); Defendant's Reply to Plaintiffs' Opposition to Defendant's Motion to Dismiss (Def.'s Reply); Plaintiffs' Sur–Reply Pursuant to Court Order Entered June 12, 2003 (Pls.'

Sur–Reply); Defendant's Response to Court's Order of July 9, 2003 (Def.'s Resp.); and Plaintiffs' Response to Court's July 9, 2003 Order (Pls.' Resp.).

2. Facts cited to the pleadings of only one of the parties do not appear to be in dispute.

Airman's Information Manual and plaintiffs' measurement of the runway pursuant to discovery obtained in *Wolfson.* Compl. ¶ 20. FAA wrote in a reply to plaintiffs on April 7, 1998, that it "did not correctly note the latest measured runway length." Exhibits to Plaintiffs['] Opposition to Defendant's Motion to Dismiss (Pls.' Opp. Ex.) D. FAA apologized to plaintiffs on behalf of the Massachusetts Aeronautics Commission (MAC)[3] "for any inconvenience this may have caused."[4] *Id.* Then, on May 18, 2000, FAA published the 61st Edition of the New York Sectional Chart,[5] an aeronautical navigation chart used to aid pilots in, *inter alia,* takeoffs and landings. Compl. ¶ 25; *see* Def.'s Mot. at 4. The New York Sectional Chart accurately indicates that the airport lies 584 feet above sea level, that the runway is now approximately 3000 feet long,[6] and that the airport does not have an air traffic control tower. Def.'s Mot. at 4 (citing Def.'s Ex. 7). Plaintiffs allege that this publication was an "approval [by defendant] of the illegal extension of the runway" which resulted in defendant's physical taking of plaintiffs' property. Compl. ¶ 37.

On June 14, 2000, after learning of the May 18, 2000 publication of the New York Sectional Chart, plaintiffs filed notices of proposed construction pursuant to 14 C.F.R. § 77.13 (1972) (requiring notice of proposed construction in airport approach areas). Compl. ¶ 25. Plaintiffs alleged that they sought to return their land to its "original condition" by replacing the hill at the end of their property and re-erecting the ten-foot boundary fence. Pls.' Opp. at 6. Plaintiffs state that returning their land to its "original condition" is "required" by Mass. Gen. Laws ch. 131 § 40 (1996)[7] and that, pursuant to Mass. Gen. Laws ch. 90 § 44 (1941) they face civil and criminal penalties for not doing so. Compl. ¶¶ 25, 29, 30; Pls.' Opp. at 14; *see* Pls.' Opp. Exs. A, B.

Pursuant to Section 44718 of Title 49 of the United States Code, FAA issued an Order in Aeronautical Study on February 15, 2001, which determined that plaintiffs' replacement hill would constitute a hazard to air navigation. Compl. ¶ 26; Pls.' Opp. at 6; Def.'s Ex. 10. FAA further determined on February 23, 2001 that plaintiffs' replacement of the ten-foot fence would constitute a thirteen-

---

3. MAC is a state transportation agency under the Massachusetts Executive Office of Transportation and Construction. http://www.massaeronautics.org/. It is responsible for airport development and improvements, aviation safety, aircraft accident investigation, navigational aids, and statewide aviation planning. *Id.* MAC also certifies airports and heliports, licenses airport managers, conducts annual airport inspections, and enforces Massachusetts safety regulations. *Id.* MAC works in partnership with FAA and state and local government to manage the financial resources necessary to maintain Massachusetts' airports. *Id.*

4. FAA further noted in its letter that the Airport's manager, not MAC, "is ultimately responsible for verifying all data listed ... and is also responsible for notification to the FAA." Pls.' Opp. Ex. D. By copy of the letter to the Airport, "the MAC ... request[ed] that the airport manager make such changes as necessary" to verify the correct runway length. *Id.*

5. Although plaintiffs originally discovered the discrepancy in the actual measured runway length and the length published by FAA through their examination of the Airport Directory of the Airman's Information Manual, the basis for their takings claim rests on FAA's publication of the

New York Sectional Chart. *See* Compl. ¶¶ 17, 18.

6. The previous New York Sectional Chart (60th Edition) indicated a runway length at the Airport of approximately 2800 feet. Def.'s Mot. at 4 n. 3 (citing Def.'s Ex. 8).

7. Section 40 of Chapter 131 of the Massachusetts General Laws governs the removal, filling, dredging, or altering of hazardous waste on land that is affecting, *inter alia,* the public, private, and ground water supply. Pls.' Opp. Ex. A. While plaintiffs have expressed concern in their complaint that their property might be in violation of Section 40, plaintiffs filed minutes of an August 15, 2001 meeting before MAC in which the MAC Commissioners "asked Mr. Breneman if there are any documents currently on file, or any record noting that hazardous waste is on his property." Pls.' Opp. Ex. J at 8. The minutes stated that "Mr. Breneman said that nobody has come out to see the area." *Id.* There is no evidence or even any allegation of any action taken by the Commonwealth of Massachusetts with respect to plaintiffs' property under this statute. Even if plaintiffs could be in some way damaged by enforcement of this statutory regime and defendant could be in some way responsible therefor, such damage is entirely speculative in

foot hazard to air navigation.[8] Compl. ¶ 26; Pls.' Opp. at 7; Def.'s Ex. 10.

Plaintiffs appealed FAA's hazard determinations to the United States Court of Appeals for the District of Columbia. *Breneman v. FAA*, 30 Fed.Appx. 7 (D.C.Cir.2002). The court held that plaintiffs lacked standing to challenge the FAA determination with regard to the fence because they did "not establish[ ] that the purely advisory determination prevents them from going ahead with the project." *Id.* at 7–8 (citing *Aircraft Owners & Pilots Ass'n v. FAA*, 600 F.2d 965, 966–67 (D.C.Cir.1979)) ("Once issued, a hazard/no-hazard determination has no enforceable legal effect. The FAA is not empowered to prohibit or limit proposed construction it deems dangerous to air navigation." (footnote omitted)). As to the hill, however, the court found that plaintiffs had standing. *Breneman v. FAA*, 30 Fed.Appx. at 8. The court found standing because plaintiffs had submitted an affidavit indicating that, although pursuant to Mass. Gen. Laws ch. 90 § 35B (1965), the MAC had determined that a permit was not necessary to erect the proposed fence, the MAC had denied plaintiffs' request for a permit to build the hill "due at least in part to [FAA's] hazard determination." *Id.;* Compl. ¶ 27. The court found that plaintiffs' inability to rebuild their hill was at least fairly traceable to the challenged hazard determination for standing purposes. *Breneman v. FAA*, 30 Fed.Appx. at 8 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 590, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The court then found "no merit to [plaintiffs'] claim that the determination is arbitrary and capricious or otherwise contrary to law" and affirmed FAA's determination as to the hill. *Breneman v. FAA*, 30 Fed.Appx. at 8.

On December 13, 2002, plaintiffs filed suit in this court alleging that, "[t]he May 18, 2000 action of the FAA in concert with their subsequent final orders and actions alone and in combination with the related actions of the [ ]MAC based upon the FAA's determination of hazard has resulted in the unlawful and unauthorized physical taking of plaintiffs' property . . . ." Compl. ¶ 28. Plaintiffs seek damages in the form of just compensation for this alleged taking. Compl. at 18 (¶¶ A–F).

Also on December 13, 2002, plaintiffs filed suit against FAA, MAC, and the Airport in the United States District Court for the District of Massachusetts.[9] *See* Def.'s Ex. 2. In that action, plaintiffs seek, *inter alia*, equitable relief, airport closure, invalidation of state and federal procedures, quiet title, and damages for inverse condemnation. *See* Pls.' Opp. at 13; Def.'s Ex. 2 at 42–46.

Defendant moves to dismiss plaintiffs' complaint for lack of subject matter jurisdiction under 28 U.S.C. § 1500 because plaintiff filed its claims in this court and the District Court in Massachusetts on the same day. Def.'s Mot. at 1. Alternatively, defendant moves to dismiss for failure to state a claim under Rule 12(b)(6) of the Court of Federal Claims (RCFC).

## II. Discussion

### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction

■ In ruling on a motion to dismiss, this court is generally "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797

---

this case and the court declines to consider it further.

**8.** The thirteen-foot hazard to air navigation was arrived at by FAA by adding to the ten feet of proposed fence height an expected three-foot penetration of the fence into ground, yielding a thirteen-foot hazard determination. Pls.' Opp. at 7 n. 4 (citing Pls.' Opp. Ex. G). Plaintiff alleges that this determination has resulted in taking their property interests not only on and above the ground, but *"below the ground* as 'navigable airspace.'"* Pls.' Opp. at 21; Compl. at 2.

**9.** Plaintiffs have submitted an affidavit of Chris A. Paulsen, Esq., which describes how plaintiffs filed their complaint in this court between 1:00 and 2:00 PM EST on December 13, 2002, and then at 2:45 PM EST on December 13, 2002 in the U.S. District Court for the District of Massachusetts. *See* Pls.' Opp. Ex. L; Pls.' Opp. at 10–11. Plaintiffs have also submitted a copy of the cover of the complaint in the U.S. District Court for the District of Massachusetts with a time stamp displaying "2:45". *See* Pls.' Opp. Ex. M. This court does not use time stamps when filing complaints.

(Fed.Cir.1995) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236–37, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). However, plaintiff, as the non-moving party, bears the burden of establishing jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988).

Here, the court must determine whether plaintiffs' claim should be dismissed pursuant to 28 U.S.C. § 1500 (1994), which states:

> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

In order to determine whether § 1500 applies, the court must first examine whether plaintiffs, when they filed in this court, had "pending in any other court any suit or process against the United States ...." 28 U.S.C. § 1500. The court will analyze this by determining when plaintiffs claims were filed here and in the Massachusetts District Court. As discussed in more detail below, *infra* nn. 6–7, the second prong of the § 1500 analysis examines whether a plaintiff asserted the "same claims" both here and in the district court. *See Loveladies Harbor, Inc. v. United States,* 27 F.3d 1545, 1554 n. 23 (Fed.Cir.1994).[10] Defendant would have the court examine both prongs independently. *See* Def.'s Mot. at 10; Def.'s Reply at 1–3. However, if the court determines that plaintiffs did not have a suit "pending", 28 U.S.C. § 1500, against the United States in another court when they filed in this court, the court need not address the "same claim" issue because the timing issue is dispositive of this court's jurisdiction. *See Hardwick Bros. Co.*

*II v. United States,* 72 F.3d 883, 886 (Fed. Cir.1995); *Teegarden v. United States,* 42 Fed.Cl. 252, 255 (1998). The court therefore first examines the plaintiffs' time of filing in both courts.

Defendant argues that same-day filings should be treated as "simultaneous" for the purposes of § 1500. Def.'s Repl. at 1 (citing *United States v. County of Cook,* 170 F.3d 1084, 1090–91 (Fed.Cir.1999)). Defendant argues that "the 'simultaneous' filing of complaints in federal district court and in the Court of Federal Claims operates to divest the Court of Federal Claims of jurisdiction." Def.'s Mot. at 9. This treatment, defendant argues, is consistent with the purpose of § 1500, which is to "'protect the United States from having to defend two lawsuits over the same manner simultaneously' by forcing plaintiffs to choose which court to pursue their claims in." Def.'s Reply at 1 (quoting *County of Cook,* 170 F.3d at 1090–91) (citation omitted). Moreover, although the District Court in Massachusetts time-stamps complaints when they are filed, Pls.' Opp. Ex. M, this court stamps only the date of the filing. Def.'s Reply at 2. Regardless of what *time* plaintiffs filed their complaint, defendant argues, this court should not be required to change its record-keeping structure or hold an evidentiary hearing to ascertain the precise timing of same-day filings, as that would unnecessarily complicate the court's procedure and "effectively eviscerate the statute." Def.'s Reply at 2–3.

Plaintiffs argue that they filed their complaint in this court *before* they filed in the United States District Court for the District of Massachusetts, thus no claim was "pending" at the time the complaint was filed in this court. Pls.' Opp. at 11. Therefore, the subsequent filing does not divest this court of jurisdiction. *Id.* Plaintiffs contend that "[t]he issue of time of filing ... 'depends upon the state of things at the *time* in deter-

---

**10.** After finding that the plaintiffs in *Loveladies Harbor* had filed suit in this court while an action was "pending" in the district court, the Federal Circuit then examined whether the plaintiffs' "claims" were the same in both courts. *Lovela-dies Harbor,* 27 F.3d at 1551. The court provided a "working definition of 'claims' for the purposes of applying § 1500," *id.,* holding that "[f]or

the Court of Federal Claims to be precluded from hearing a claim under § 1500, the claim pending in another court must arise from the *same operative facts,* and must seek *the same relief.*" *Id.* Because the claim in the district court sought "distinctly different" relief than the claim in this court, this court was not divested of jurisdiction under § 1500. *Id.* at 1554.

mining jurisdiction of the action [is][sic] brought.'" Pls.' Opp. at 9 (quoting *County of Cook,* 170 F.3d at 1090). Thus, because they filed in this court at an earlier *time* than they filed in the Massachusetts District Court, plaintiffs' complaint should not be dismissed for lack of subject matter jurisdiction under § 1500. *See* Pls.' Opp. at 11.

The caselaw regarding the time of filing claims here and in a district court and the subsequent jurisdictional effect of § 1500 on those claims is not clearly dispositive of the issue of same-day filing. Plaintiffs cite this court's opinion in *Tecon Engineers* for the proposition that the later filing of a claim in district court does not divest this court of jurisdiction. *See* Pls.' Opp. at 10 (citing *Tecon Eng'rs. Inc. v. United States,* 170 Ct.Cl. 389, 343 F.2d 943 (1965)) (filing in this court prior to filing in district court). In *Tecon Engineers,* this court found that the language of § 1500 did not

> provide for a disruption of this court's lawful jurisdiction by the mere filing of a petition in the District Court on the same claim that is then actually pending here. The words "shall not have jurisdiction" pertain solely to the acquiring or taking of jurisdiction by this court when the same plaintiff *already* "has pending in any other court" another suit on the same claim. Not only is the legislative history of Section 1500 devoid of any intimation to the contrary; its legal evolution in the Congress supports our conclusion.

*Tecon Engineers,* 343 F.2d at 946 (quoting 28 U.S.C. § 1500) (emphasis added).

However, the United States Court of Appeals for the Federal Circuit criticized *Tecon Engineers* in its decision in *UNR Industries, Inc. v. United States,* 962 F.2d 1013, 1023 (Fed.Cir.1992), *aff'd sub nom. Keene Corp. v. United States,* 508 U.S. 200, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993). In order to remedy a statute "rife with judicially created exceptions and rationalizations to the point that it no longer serves its purposes," *UNR Industries,* 962 F.2d at 1021, the Federal Circuit held, *inter alia,* that "if the same claim is filed in another court after the complaint is filed in the Claims Court, the Claims Court is by that action divested of jurisdic-

tion." *Id.* Thus, because the goal of § 1500 is "to force an election of forum and prevent simultaneous dual litigation against the government," *id.,* "Tecon is overruled." *Id.* at 1023.

The law regarding § 1500 and time of filing was not settled after *UNR Industries,* however. Although the United States Supreme Court affirmed *UNR Industries* on appeal, the Court held that it did not have to overrule *Tecon Engineers* to do so, inasmuch as the Court's decision "turns on Keene's earlier filed District Court actions, and even Keene now concedes it to be 'unnecessary for the Court to address the *Tecon* question' in ruling on the dismissal of Keene's claims." *Keene Corp. v. United States,* 508 U.S. at 216, 113 S.Ct. 2035. Thus, the Court did "not decide whether [§ 1500] also continues to bar a plaintiff from prosecuting a claim in the Court of Federal Claims while he has pending a later-filed suit in another court . . . ." *Id.* at 209 n. 4, 113 S.Ct. 2035 (citations omitted).

In *Loveladies Harbor,* the Federal Circuit sitting *en banc* stated that "[a]s the Supreme Court has reminded us, anything we said in *UNR* regarding the legal import of cases whose factual bases were not properly before us was mere dictum, and therefore we will not accord it stare decisis effect." *Loveladies Harbor,* 27 F.3d at 1549. The following year, the Federal Circuit removed any remaining doubt as to the appeal court's view: "After *UNR/Keene* and *Loveladies [Harbor],* *Tecon Engineers* remains good law and binding on this court." *Hardwick Bros. Co. II,* 72 F.3d at 886. Thus, "Hardwick's later-filed district court action did not deprive the Court of Federal Claims of jurisdiction over Hardwick's contract claim." *Id.*

Following *Hardwick,* this court recently stated that "[t]he sum of these cases leads us to conclude that the same action filed in district court prior to being filed in the Court of Federal Claims divests the latter of jurisdiction, as do actions filed simultaneously, but actions filed in district court subsequent to the Court of Federal Claims filing are not considered 'pending' in the language of Section 1500, and thus do not divest this court of jurisdiction." *Spodek v. United States,* 44

Fed.Cl. 32, 41 (1999). Furthermore, this court has added that " 'pendancy,' for purposes of applying section 1500, is measured as of the *time* of the filing of the Court of Federal Claims action." *Vaizburd v. United States,* 46 Fed.Cl. 309, 311 (Fed.Cl.2000) (emphasis added) (citing *Keene,* 508 U.S. at 207, 113 S.Ct. 2035); *see also Loveladies Harbor,* 27 F.3d at 1548 ("The question of whether another claim is 'pending' for purposes of § 1500 is determined at the *time* at which the suit in the Court of Federal Claims is filed . . . .") (emphasis added).

Here, defendant asks the court to hold that actions filed in this court and another on the same day be treated as "simultaneous" for the purposes of § 1500. Def.'s Reply at 1. Thus, defendant contends, the rule articulated in *Spodek* should apply and this court should be divested of its jurisdiction to hear plaintiffs' claim. *Id.* Defendant fails to cite, and the court has not found, any case law which deals with the exact issue in this case. Defendant relies on *County of Cook,* which held that "the 'filing' of the same claim simultaneously in the district court and the Court of Federal Claims by operation of § 1631 deprives the latter court of jurisdiction pursuant to § 1500." *County of Cook,* 170 F.3d at 1091. However, because that case dealt with claims which had been filed together in the federal district court, some of which were transferred from the district court to the Court of Federal Claims pursuant to 28 U.S.C. § 1631 while some remained in the district court, *County of Cook* is distinguishable from this case. *See id.* at 1090. Indeed, the Federal Circuit noted in *County of Cook* that "[s]ection 1631 mandates that the transferred claims be treated as if they were filed in the transferee court at the *time* they were filed in the transferor court." *Id.* at 1091 n. 8 (emphasis added). Thus, the plaintiff's claims in that case were truly filed "simultaneously" with respect to the claims not transferred and remaining in the district court. Accordingly, the court ruled that § 1500 pre-

cluded jurisdiction over the claims in the Court of Federal Claims given the pendency of the other claims before the district court. *Id.* at 1092.

The Federal Circuit briefly had before it the issue of same-day filing of complaints in *Richmond, Fredericksburg, & Potomac Railroad Company v. United States,* 75 F.3d 648, 653 (Fed.Cir.1996). However, the plaintiff amended its complaint in this court while the district court's dismissal was on appeal in the Fourth Circuit, and thus "[b]ecause the district court suit and the suit in the Court of Federal Claims under the amended complaint did not seek the same relief, 28 U.S.C. § 1500[did] not apply." *Id.* (citation omitted). The court therefore noted, "Since we find that the jurisdictional flaw was subsequently cured, we need not address the question of whether, though filed on the same day, the suit in the Court of Federal Claims might have been the first filed and therefore possibly entitled to the benefit of the rule in *Tecon Engineers.*" *Id.* at 653 n. 2 (citations omitted).

It is the court's opinion that plaintiffs here should be entitled to the benefit of the rule in *Tecon Engineers.* Plaintiffs have submitted the affidavit of Chris A. Paulsen, Esq., which describes plaintiffs' filing of their complaint in this court between 1:00 and 2:00 p.m. EST on December 13, 2002, and then in the United States District Court for the District of Massachusetts at 2:45 p.m. EST on December 13, 2002. *See* Pls.' Opp. Ex. L; Pls.' Opp. at 10–11. Plaintiffs have also submitted a copy of the cover of the complaint in the United States District Court for the District of Massachusetts with a time stamp displaying "2:45." *See* Pls.' Opp. Ex. M. The preponderance of the evidence, *see Reynolds,* 846 F.2d at 748, favors a finding that there was not "pending in any other court any suit or process against the United States," 28 U.S.C. § 1500, at the time plaintiffs filed their complaint here.[11]

---

11. Because the court finds that plaintiffs did not have a claim "pending" in the federal district court for the District of Massachusetts when they filed in this court, the court need not address whether their "claims" are the same in both courts for the purposes of § 1500. Cases in this

court that have involved later-filed district court actions have not been dismissed for lack of jurisdiction under § 1500 even if both claims were the same. *See Hardwick,* 72 F.3d at 885 (holding that the later-filed district court action did not divest this court of jurisdiction even though the

B. Motion to Dismiss for Failure to State a Claim or Motion for Summary Judgment

RCFC 12(b)(6) governs the dismissal of a claim for "failure to state a claim upon which relief can be granted." RCFC 12(b)(6). A motion under RCFC 12(b)(6) "addresses 'the question of whether in a specific case a court is able to exercise its general power with regard to the facts peculiar to the specific claim.'" *Crawford v. United States,* 53 Fed. Cl. 191, 192 (2002) (quoting *Palmer v. United States,* 168 F.3d 1310, 1313 (Fed.Cir.1999)). Under RCFC 12(b)(6), the court must accept as true the facts alleged in the complaint, *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 633, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999), and must construe all reasonable inferences in favor of the non-movant, *Sommers Oil Co. v. United States,* 241 F.3d 1375, 1378 (Fed.Cir.2001). A court must grant the motion "when the facts asserted by the plaintiff do not entitle him to a legal remedy." *Boyle v. United States,* 200 F.3d 1369, 1372 (Fed.Cir.2000). A dismissal under RCFC 12(b)(6) "constitutes an adjudication on the merits of a claim." *Crawford,* 53 Fed.Cl. at 192 (citing *Maniere v. United States,* 31 Fed. Cl. 410, 419 (1994)).

A motion to dismiss for failure to state a claim upon which relief can be granted is treated as a motion for summary judgment under Rule 56 if "matters outside the pleadings are presented to and not excluded by the court." RCFC 12(b)(6). Both parties included materials outside of the pleadings in their briefing. Therefore, the court addresses defendant's motion as a motion for summary judgment under Rule 56.

Under Rule 56, summary judgment is warranted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact that might significantly affect the outcome of the litigation is material. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Disputes over facts that are not outcome determinative will not preclude the entry of summary judgment. *Id.* at 247–48, 106 S.Ct. 2505.

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562–63 (Fed.Cir.1987). The movant is also entitled to summary judgment if the non-movant fails to make a showing sufficient to establish an element of its case on which it will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir. 1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

1. Publication of an Aeronautical Chart

Plaintiffs argue that defendant claimed rights to "navigable airspace" over and on plaintiffs' property when, on May 18, 2000, FAA published the 61st Edition of the New York Sectional Chart recognizing the

court below had "found that there was 'no material difference' in the operative facts in the two actions" and were the "same claims" for the purposes of § 1500); *Teegarden,* 42 Fed.Cl. at 255 n. 3 ("The court is not persuaded by plaintiff[s'] assertion that the later-filed district court claim arises from a different set of operative facts than does the claim filed in this court .... [H]owever, despite defendant's assertion to the contrary, plaintiffs' claim should not be dismissed merely because both claims arise from the same operative facts."). These cases instruct that the court retains jurisdiction because plaintiffs filed their complaint here before filing in the district court. Once the court finds that plaintiffs' claim was first filed in this court, defendant's motion to dismiss for lack of subject matter jurisdiction must be denied, regardless of whether plaintiffs' later-filed action involved the same claim as defined for purposes of § 1500. *Hardwick,* 72 F.3d at 885; *Teegarden,* 42 Fed.Cl. at 255.

Airport's extended runway. Pls.' Opp. at 17. This, plaintiffs contend, subjected their property to a "navigable servitude" and caused it to come under exclusive federal control and regulation. *Id.* at 18. Plaintiffs argue that defendant's action constitutes a physical taking of plaintiffs' property by transferring newly and illegally created "navigable airspace" from plaintiffs to the public. *Id.* at 3.

Defendant argues that the publication of the New York Sectional Chart is not a final agency action or decision that regulates, restricts, limits, or prohibits the use of plaintiffs' property in any manner. Def.'s Mot. at 14–15. Furthermore, defendant argues, the publication of the updated New York Sectional Chart merely provides an accurate depiction of the existing runway length of the Airport and does not represent "approval" of the Airport's allegedly illegal extension of its runway in 1988. *Id.* at 15. For these reasons, defendant argues that plaintiffs' claim based on FAA's aeronautical chart publication should be dismissed for failure to state a claim. *Id.*

As the Federal Circuit has stated, the analysis of a takings claim involves two steps:

> First a court determines whether the plaintiff possesses a valid interest in the property affected by the governmental action, i.e., whether the plaintiff possessed a "stick in the bundle of property rights." If a plaintiff possesses a compensable property right, a court proceeds to the second step. Under that second step, a court determines whether the governmental action at issue constituted a taking of that "stick."

*Karuk Tribe of Cal. v. Ammon,* 209 F.3d 1366, 1374 (Fed.Cir.2000) (citing *M & J Coal Co. v. United States,* 47 F.3d 1148, 1154 (Fed.Cir.1995)).

Thus, the court must first determine whether plaintiffs possessed a compensable property interest that was allegedly taken by the publication of the New York Sectional Chart. The court then determines whether that publication in fact amounted to a taking of plaintiffs' property interest.

In the leading case in this area of takings jurisprudence, *United States v. Causby,* 328

U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), the Supreme Court held that the United States "has 'complete and exclusive national sovereignty in the airspace ....' " *Id.* at 260, 66 S.Ct. 1062 (quoting 49 U.S.C. § 176(a) *repealed by* Federal Aviation Act of 1958, Pub.L. 85–726, title XIV § 1401(a), 72 Stat. 731, 806 (1958)). The Court added that United States citizens have a " 'a public right of freedom of transit in air commerce through the navigable airspace of the United States ....' " *Id.* (quoting 49 U.S.C. § 403, *repealed by* Federal Aviation Act of 1958, Pub.L. 85–726, title XIV § 1401(b), 72 Stat. 731, 806 (1958)). At the time of the *Causby* case, Congress had placed the navigable airspace in the public domain, defining it as "airspace above the minimum safe altitudes of flight prescribed" by the Civil Aeronautics Administration. *Id.* at 263, 66 S.Ct. 1062. Thus, "[f]lights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land." *Id.* at 266, 66 S.Ct. 1062. In *Causby,* the court found that low flights of military planes over a chicken farm made the property unusable for the owner's purpose. *Id.* at 267, 66 S.Ct. 1062. The Court therefore held that there had been a taking of an air easement for which compensation must be paid. *Id.*

*Causby* was the first in a series of cases in which plaintiffs were able successfully to sue the government for a compensable taking for flights by government aircraft in the public domain that are so frequent and low as to constitute a direct, immediate, and substantial interference with the use and enjoyment of the subject property. *See, e.g., Adaman Mut. Water Co. v. United States,* 143 Ct.Cl. 921, 931–34, 181 F.Supp. 658 (1958) (finding a compensable taking of plaintiffs' property based on interferences with plaintiffs' use and enjoyment of property as a result of noise made and disturbances created by government aircraft after the extension of a runway); *Mid–States Fats & Oils Corp. v. United States,* 159 Ct.Cl. 301, 331–32, 1962 WL 9324 (1962) (finding a compensable taking based on the reactivation of a military airbase adjacent to plaintiff's property with frequent flights of low-flying military aircraft); *Bacon v. United States,* 155 Ct.Cl.

441, 443, 295 F.2d 936 (1961) (same); *A.J. Hodges Indus., Inc. v. United States,* 174 Ct.Cl. 259, 262, 355 F.2d 592 (1966) ("The courts have held that when regular and frequent flights by Government-owned aircraft over privately owned land at altitudes of less than 500 feet from the surface of the ground constitute a direct, immediate, and substantial interference with the use and enjoyment of the property, there is a taking by the Government of an avigation easement, or easement of flight, in the airspace over the property, and that this taking is compensable under the Fifth Amendment to the Constitution."); *Argent v. United States,* 124 F.3d 1277, 1279 (Fed.Cir.1997) (same). Thus, the general rule from the *Causby* line of cases is that "low altitude flights which unreasonably interfere with the use and enjoyment of the land represent a trespass or partial taking creating a right of compensation," *County of Westchester v. Town of Greenwich, Conn.,* 793 F.Supp. 1195, 1204 (S.D.N.Y.1992), *rev'd on other grounds,* 9 F.3d 242 (2d Cir.1993), and "[e]ven when such flights fall within the navigable airspace, and therefore use of this low altitude airspace is authorized, compensation is still required for the taking." *Id.* Absent from this line of cases is any finding of a taking related to the mere creation or recognition of navigable airspace, as is claimed here.

Following the decision in *Causby,* Congress enacted the Federal Aviation Act of 1958, Pub.L. 85-726, 72 Stat. 731 (1958), which redefined "navigable airspace" as the "airspace above the minimum altitudes of flight prescribed by regulations .... including airspace needed to ensure safety in the takeoff and landing of aircraft." 49 U.S.C. § 40102(a)(30) (2000). Shortly thereafter, the Supreme Court heard another "air easement" (also termed "avigation easement") case. *Griggs v. Allegheny County,* 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962). In *Griggs,* the plaintiff alleged a taking of an air easement over its property, which was located beneath the takeoff and landing paths of an airport runway. 369 U.S. at 86–87, 82 S.Ct. 531. The airport was owned by Allegheny County, Pennsylvania, which had obtained the land on which the airport was built with aid provided in part by the federal government. *Id.* at 86, 82 S.Ct. 531. The government agreed to share from 50% to 75% of the "allowable project costs," *id.* (quoting 49 U.S.C. § 1109, *repealed by* Airport and Airway Development Act of 1970, Pub.L. 91–258, title I § 52(a), 84 Stat. 235 (the 1970 Act)), including the " 'costs of acquiring land or interests therein or easements through or other interests in air space ....' " *Id.* (quoting 49 U.S.C. § 1112(a)(2), *repealed by* the 1970 Act). Moreover, Allegheny County was required by statute to obtain permission from the Civil Aeronautics Administrator (CAA) to set up its runways in the locations that it did. *Id.* at 85–86, 82 S.Ct. 531 (citing 49 U.S.C. § 1108, *repealed by* the 1970 Act). The plaintiff in *Griggs* argued that there was a taking and that the airlines or the CAA acting as an authorized representative of the United States, rather than the airport operator, was responsible. *Id.* at 89, 82 S.Ct. 531. The Supreme Court rejected this argument, stating:

> We think, however, that respondent [airport operator], which was the promoter, owner, and lessor of the airport, was in these circumstances the one who took the air easement in the constitutional sense. Respondent decided, subject to the approval of the C.A.A., where the airport would be built, what runways it would need, their direction and length, and what land and navigation easements would be needed. The Federal Government takes nothing; it is the local authority which decides to build an airport *vel non,* and where it is to be located. We see no difference between its responsibility for the air easements necessary for operation of the airport and its responsibility for the land on which the runways were built.

*Id.* (internal footnote omitted). Thus, even though the United States provided funding for the airport and specifically granted the airport permission to place its runways in the places that it did, the Supreme Court found that it was the airport operator who "took" the plaintiff's property and not the federal government. *Id.* Indeed, it was the airport operator who built the airport, placed the runways, and leased to airlines the right to take off and land over the plaintiff's proper-

ty. *Id.* at 86, 82 S.Ct. 531. The federal government "takes nothing" in such a situation. *Id.* at 89, 82 S.Ct. 531. As defendant argues, *see* Def.'s Mot. at 11–12, the United States' involvement in this matter through the mere publication of the New York Sectional Chart is quite different and even less active than the government involvement rejected by the court as a basis for a taking in *Griggs.*

Plaintiffs have suggested no authority which supports their claim that the publication of the New York Sectional Chart, or indeed any FAA aeronautical chart, could constitute a compensable taking. "Aeronautical charts are highly technical tools. They are graphic depictions of technical, mechanical data. The best analogy to an aeronautical chart is a compass. Both may be used to guide an individual who is engaged in an activity requiring certain knowledge of natural features." *Winter v. G.P. Putnam's Sons,* 938 F.2d 1033, 1036 (9th Cir.1991).

The New York Sectional in particular is published by FAA's National Aeronautical Charting Office (NACO). Def.'s Mot. at 4; Def.'s Ex. 7 p. 77. NACO publishes approximately 37 of these sectional charts covering the continental United States and portions of Canada and Mexico. Def.'s Mot. at 4. Coordination with the Department of Defense and other agencies is often required. http://www.naco.faa.gov/index.asp?xml=naco /about. Many charts are revised and published every 28 days. *Id.* FAA is authorized, but not required, to publish such charts. *Reminga v. United States,* 631 F.2d 449, 452 (6th Cir.1980) (citation omitted).

Although not required by law to do so, when FAA does arrange "for the publication of aeronautical navigation charts and engenders reliance on them, it is required to use due care to see that they accurately depict what they purport to show." *Id.* In *Reminga,* the court viewed it as critical for safety and navigation purposes that the charts accurately depict airport runway lengths and locations, height and location of obstructions,

and other information required by pilots. *See id.;* Def.'s Mot. at 4. Indeed, if FAA exercises its discretion to issue such charts and is negligent by failing to locate hazards or accurately depict runways, courts have held that the government should be held liable for such negligence if it causes injury or damage. *See Reminga,* 631 F.2d at 452 (finding government liable when TV tower's ground location was depicted inaccurately on chart); *Allnutt v. United States,* 498 F.Supp. 832, 835 (W.D.Mo.1980) (finding government liable when chart failed to depict existing power transmission line). Thus, it is very important that FAA accurately represent the existing conditions on the ground when it publishes aeronautical navigation ·charts. Each year, therefore, "thousands of changes in information affecting the safety of navigable airspace are made with the sole purpose of maintaining certified and safe airspace." http://www.naco.faa.gov/index.asp?xml=naco /about.

An aeronautical navigation chart is therefore merely an accurate depiction of relevant obstructions or conditions in existence at the time of the publication. *Reminga,* 631 F.2d at 452. While plaintiffs do have property interests in their land, to the extent that these interests were interfered with or taken, it was not through FAA's publication of the New York Sectional Chart.[12] The court does not see how such a publication could possibly physically appropriate or "take" plaintiffs' land.

Plaintiffs also have some property interests in the airspace *above* their land. Indeed, "[t]he fact that the planes never touched the surface would be … irrelevant …." *Causby,* 328 U.S. at 262, 66 S.Ct. 1062. Plaintiffs' "right to possess and exploit the land-that is to say, [their] beneficial ownership of it-would be destroyed" if planes flying overhead prevented plaintiffs from using their property. *Id.* at 262, 66 S.Ct. 1062.

The only cases, however, in which the government causes the imposition of a "navigable servitude" through the taking of a plaintiff's property interest "above the ground"

**12.** Plaintiffs' alternative theory, that FAA's hazard determinations amounted to a taking of their property "on, above, and *below the ground,*"

Compl. at 2; Pls.' Opp. at 21, is addressed below in Part II.B.2.

are those in which the flight of *government* aircraft is "so low and so frequent as to be a direct and immediate interference with the enjoyment and use of [plaintiff's] land." *Causby,* 328 U.S. at 266, 66 S.Ct. 1062; *see also Hero Lands Co. v. United States,* 554 F.Supp. 1262, 1 Cl.Ct. 102, 104 ("[S]o long as flights by government-owned aircraft through the airspace above land do not interfere substantially with the use and enjoyment of the property, the Government is not liable to the landowner for the taking of an avigation easement ...."), *aff'd,* 727 F.2d 1118 (Fed.Cir.1983), *cert. denied,* 466 U.S. 972, 104 S.Ct. 2346, 80 L.Ed.2d 819 (1984). Thus, it is the *use* by the government of navigable airspace that can amount to a taking of a plaintiff's property and not merely the government's *recognition* of the existence of the navigable airspace. In the case of mere recognition, "[t]he Federal Government takes nothing." *Griggs,* 369 U.S. at 89, 82 S.Ct. 531.

Finding no authority supporting a taking claim based on the publication of an aeronautical chart, plaintiffs seek to analogize the present case to *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). In *Kaiser Aetna,* the petitioners were the owners of a shallow, privately operated pond that was not connected to any navigable waterway and not subject to a federal navigational servitude. *Id.* at 166, 100 S.Ct. 383. In 1961, the petitioners dredged a channel to connect the pond with a bay and the Pacific Ocean, both navigable bodies of water. *Id.* at 167, 100 S.Ct. 383. The petitioners increased the average depth of the channel from two to six feet and created accommodations for pleasure boats, thereby creating a marina. *Id.* Furthermore, the petitioners made improvements to allow boats from the marina to enter and return from the bay, as well as to provide for better water conditions. *Id.* The petitioners controlled all access to and use of the marina, charged an access fee for customers' entrance, and generally did not permit other commercial use of the marina. *Id.* at 168, 100 S.Ct. 383.

Then, in 1972, a dispute arose between the *Kaiser Aetna* petitioners and the United States Army Corps of Engineers (Corps) concerning whether the petitioners were required to obtain the Corps' permission to make future improvements and whether the petitioners were precluded from denying the public access to the pond because, as a result of the improvements, the pond had become a navigable water of the United States. *Id.* The dispute ripened into a lawsuit by the U.S. Government against the petitioners in the United States District Court for the District of Hawaii, which held that the pond was now "navigable water of the United States" and thus subject to regulation by the Corps under § 10 of the Rivers and Harbors Appropriation Act. *United States v. Kaiser Aetna,* 408 F.Supp. 42, 55 (D.Haw.1976), *aff'd in part and rev'd in part,* 584 F.2d 378, 384 (9th Cir.1978). On appeal, the Court of Appeals for the Ninth Circuit found that the navigational servitude also required the petitioners to grant the public access to the pond, but held that this did not require just compensation to the petitioners by the government. *United States v. Kaiser Aetna,* 584 F.2d 378, 384 (9th Cir.1978), *rev'd,* 444 U.S. 164, 180, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). The Supreme Court reversed, holding that the government, in making its determination that the petitioners' once-private pond must now be a "public aquatic park," had taken the plaintiffs' right to exclude. *Id.* at 180, 100 S.Ct. 383. Accordingly, the Court held that "the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation." *Id.* at 179–180, 100 S.Ct. 383.

Plaintiffs here note that "[t]he taking in *Kaiser Aetna* occurred *not* in *1961* when the pre-existing channel was dredged out but in *1972* when a dispute arose and the Federal Government imposed its 'navigable servitude' upon the private pond." Pls.' Sur–Reply at 7. Therefore, plaintiffs contend, "As in *Kaiser Aetna,* the taking of the Plaintiffs' property occurred not on the date the new navigable airspace was created but on the date the United States imposed its navigable servitude upon the property." *Id.* The court believes that plaintiffs' analogy is misplaced. In *Kaiser Aetna,* navigable waters were not

in fact "created" in 1961 through the dredging of the channel and creation of the marina. Indeed, the petitioners in *Kaiser Aetna* had the right to exclude others throughout the 1960s and until the Corps' determination and the subsequent court order in the 1970s. *See Kaiser Aetna*, 444 U.S. at 168, 100 S.Ct. 383. Thus, it was only after the Corps made its determination that the pond was subject to public access as "navigable waters" that the petitioners' property rights were expropriated.

In contrast, plaintiffs here have not excluded anyone or anything, including the Airport or its traffic, since the Airport's extension of the runway before August 1991. Plaintiffs appear to be correct when they state that "the creation of new 'navigable airspace' by the removal of the shielding hill on Plaintiffs' property has destroyed ... their 'right to exclude'...." Pls.' Opp. at 18. To the extent that plaintiffs' "right to exclude" was taken, however, it was through no action of the United States. Unlike the Corps' determination and the subsequent court order in *Kaiser Aetna*, FAA's publication of the New York Sectional Chart had no effect on plaintiffs' existing property rights, nor did it alter plaintiffs' use of their property or their "right to exclude" others from it. These property rights had already been privately expropriated. FAA did not, as plaintiff contends, "open[ ] to the public the extension of the runway of the Tanner Hiller Airport with the publication of the 61st edition of the New York Sectional Chart." Compl. ¶ 18. The runway was *already* open to the public. An aeronautical chart is descriptive. Unlike an exercise of federal power through a determination by the Corps, the publication of an aeronautical chart does not operate to create a public right in formerly private property. *See Griggs*, 369 U.S. at 89, 82 S.Ct. 531.

### 2. FAA Hazard Determinations

■ Plaintiffs' takings claim is also premised on FAA's issuance of the two hazard determinations in February 2001. Compl. ¶ 4. Plaintiffs argue that "[t]he February 15, 2001 and February 23, 2001 final orders of the FAA together with the actions of the [ ]MAC and provisions of [Mass. Gen. Laws

ch.] 90 § 44 provide for the use of plaintiffs' property by others and constitutes [sic] an unlawful taking of their property under the Fifth Amendment of the Constitution of the United States." *Id.* FAA's hazard determinations, plaintiffs allege, prevent them from returning their land to its "original condition" as mandated by Mass. Gen. Laws ch. 131 § 40 and cause them to face criminal and civil penalties under Mass. Gen. Laws ch. 90 § 44. *Id.* ¶¶ 25, 29. Because the MAC denied plaintiffs a permit to "replace the hill to restore their land to its 'original condition' based in part upon the FAA's determination of hazard," *id.* ¶ 27, plaintiffs argue that FAA is responsible for the physical taking of their property. *Id.* ¶ 28.

Notwithstanding plaintiffs' characterization of the alleged taking as a physical one, the law provides that "[w]hen the nature of the government action does not constitute a physical [occupation] of [the subject] property but, rather, limits the use a property owner may make of his property," a regulatory taking analysis is appropriate. *Cane Tennessee, Inc. v. United States*, 54 Fed.Cl. 100, 104 (2002). "[T]he classic analytical tool for assessing whether a [regulatory] taking has occurred is the three-part test developed by the Supreme Court in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)." *Id.* In particular, the court must examine the character of the governmental action, the economic impact on the claimant, and the extent to which the governmental action has interfered with distinct investment-backed expectations. *See Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646; *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 212, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986); *Cienega Gardens v. United States*, 331 F.3d 1319, 1337 (Fed.Cir.2003); *Avenal v. United States*, 100 F.3d 933, 938 (Fed.Cir.1996). In this case, the conflict centers on the nature of the governmental action.

Defendant argues that hazard determinations "are advisory only, have no legal effect, and do not—standing alone—give rise to a takings claim against the United States." Def.'s Reply at 8. Defendant relies chiefly on *Flowers Mill Assocs. v. United States*, 23

Cl.Ct. 182, 189 (1991) for the proposition that a hazard determination "cannot be the basis for a Fifth Amendment taking claim against the government." Thus, defendant argues, plaintiffs' claim must be dismissed for failure to state a claim. Def.'s Mot. at 14.[13]

In *Flowers Mill*, this court squarely addressed whether the FAA's issuance of a hazard determination can give rise to a taking. The facts of *Flowers Mill* are very similar to the facts of this case. The plaintiff owned land adjacent to a privately-owned airport. *Flowers Mill*, 23 Cl.Ct. at 183–84. The plaintiff proposed to construct a one-story building on its property that was to be located approximately 700 feet from the end of the airport runway. *Id.* In compliance with federal law pursuant to 14 C.F.R. § 77.11(a), the plaintiff notified FAA of this proposed construction. *Id.* at 184. FAA then conducted an aeronautical study concerning the effect of the plaintiff's proposed building on the safe and efficient use of the airport. *Id.* Thereafter, FAA issued a "Determination of Hazard to Air Navigation," finding that "because the proposed structure would have a substantially adverse effect on the safe and efficient use of airspace by aircraft, it would be a hazard to air navigation . . . ." *Id.* at 185. The plaintiff appealed the FAA's decision to the Court of Appeals for the Third Circuit, but the decision was upheld by that court in an unpublished opinion. *Flowers Mill Assocs. v. FAA*, 888 F.2d 1379 (3d Cir. Oct.12, 1989) (unpublished). The plaintiff then filed suit in this court, alleging that FAA's hazard determination amounted to a taking of its property under the Fifth Amendment without just compensation. *Flowers Mill*, 23 Cl.Ct. at 185. The plaintiff argued that the hazard determination effected a taking as a practical matter because it was unable to obtain the necessary financing and insurance to commence the construction as a result of the FAA's determination. *Id.* at 189. As here, the government moved to dismiss for failure to state a claim. *Id.* at 183.

The court in *Flowers Mill* noted that "[t]he issue of whether an FAA determination that a proposed structure presents a hazard to air navigation constitutes a regulatory taking is apparently one of first impression in the Claims Court and the Federal Circuit." *Id.* at 186. Accordingly, the court closely examined the FAA's regulatory process prior to determining the constitutional question before it. In so doing, the court noted a D.C. Circuit case which observed that a hazard/no-hazard determination had "no enforceable legal effect":

> Once issued, a hazard/no-hazard determination has no enforceable legal effect. The FAA is not empowered to prohibit or limit proposed construction it deems dangerous to air navigation . . . . Primarily . . . the determination promotes air safety through 'moral suasion' by encouraging the voluntary cooperation of sponsors of potentially hazardous structures.

*Id.* (quoting *Aircraft Owners and Pilots Ass'n v. FAA*, 600 F.2d 965, 967 (D.C.Cir. 1979)). Therefore, although the court stated that " 'moral suasion' is a considerably potent force in our society," *id.* at 187, and that "it is obvious that this determination would have constituted a considerable 'stumbling block' to the proponents," *id.*, the court held that "[t]his type of government action is fundamentally different from the physical destruction or intrusion on property attendant to an act of eminent domain. Consequently, it cannot be the basis for a Fifth Amendment taking claim against the government." *Id.*

Indeed, despite the inability of the plaintiff in *Flowers Mill* to obtain the necessary financing and insurance to commence construction as a result of the hazard determination, the plaintiff had conceded that "FAA's determination is technically only advisory and that no permit from FAA is required." *Id.* at 189. Thus, the court held that "[e]ven assuming that Flowers Mill has been damaged by inability to develop its property in the manner intended because third parties relied on FAA's determination, FAA still has

---

**13.** Neither party has suggested a binding precedent on this issue and the court has located none. The court has examined numerous state and federal authorities of a non-precedential nature, all of which are consistent with each other and with the court's conclusion.

not acted in any way to interfere with plaintiff's property rights." *Id.* at 189–90.

The Pennsylvania Superior Court reached a similar conclusion in 1993. *Commonwealth v. Rogers,* 430 Pa.Super. 253, 634 A.2d 245, 252 (1993). The *Rogers* court held that an FAA hazard determination "was advisory only and not legally enforceable." *Id.* The court observed that "[a] landowner is not required to obtain a permit from FAA before proceeding with development, and FAA has no power to prevent construction," *id.,* and concluded that "the FAA action cannot be the basis of a Fifth Amendment taking because of the voluntary nature of the regulatory scheme." *Id.* at 252–53 (citing *Aircraft Owners and Pilots Ass'n,* 600 F.2d 965); *see also 3775 Genesee St., Inc. v. State,* 99 Misc.2d 59, 415 N.Y.S.2d 575, 579 (N.Y.Ct.Cl. 1979) ("The FAA cannot issue a cease and desist order preventing construction. It can only seek voluntary compliance by a private landowner.") (citations omitted).

FAA's hazard determinations have also been examined in a takings context by the Court of Claims of New York, which determined that a finding of hazard is advisory only and cannot constitute a taking. *Kupster Realty Corp. v. State,* 93 Misc.2d 843, 404 N.Y.S.2d 225, 231 (N.Y.Ct.Cl.1978). The *Kupster Realty* court concluded that local airport operators who actually commit the act of taking neighboring land, *see id.* (citing *Griggs,* 369 U.S. at 89–90, 82 S.Ct. 531), or state agencies that actually can enforce orders prohibiting construction, can be held responsible for a landowner's loss of property rights due to adjacent airport actions, but that FAA could not be similarly held responsible. *Id.*

Consistent with the foregoing authorities, the court finds that FAA's determinations of hazard based on plaintiffs' proposed construction of a hill and fence on their property do not amount to a taking under the Fifth Amendment. FAA's hazard determinations simply have "no enforceable legal effect. The FAA is not empowered to prohibit or limit proposed construction it deems dangerous to air navigation." *Flowers Mill,* 23 Cl.Ct. at 186 (quoting *Aircraft Owners and Pilots Ass'n,* 600 F.2d at 967). As stated in *Flowers Mill,* "FAA's determination is technically only advisory and ... no permit *from* FAA is required." *Flowers Mill,* 23 Cl.Ct at 189 (emphasis added).[14] To the extent that plaintiffs were denied their property rights, it was because of MAC's denial of a permit and not because of any action by FAA. Even if MAC relied on FAA's hazard determination in deciding not to issue a permit to build the hill, it was not required to do so. This is evidenced by the fact that MAC did not prohibit plaintiffs from building the proposed fence on their property even after FAA's determination of hazard with regard to it. Plaintiffs' argument here is closely analogous to the plaintiff's argument in *Flowers Mill.* Just as the court there declined to find a taking because FAA's hazard determination influenced a third party to deny the plaintiff adequate insurance and financing, the court here declines to find a taking by FAA because of MAC's denial of a permit. Of course, the court expresses no opinion on whether MAC's denial of a permit to build a hill on plaintiffs' property could support a takings claim against MAC.

### III. Conclusion

For the foregoing reasons, defendant's motion to dismiss under Rule 12(b)(1) is DE-

---

**14.** Plaintiffs have provided no evidence for their claim, *see* Pls.' Opp. at 3–4, that they are or will be subject to civil or criminal penalties under Mass. Gen. Laws ch. 90 § 44 for not returning their land to its "original condition." Mass. Gen. Laws ch. 90 § 44 provides civil and criminal penalties for violations of Mass. Gen. Laws ch. 90 §§ 35–52 (1965). Plaintiffs allege that FAA's hazard determinations caused MAC to deny plaintiffs a permit to build the hill which is "otherwise legally mandated by [Mass. Gen. Laws ch.] 90 § 35D" and thus plaintiffs are subject to these penalties. Pls.' Opp. at 3 (citing Pls.' Opp. Ex. B at 4). However, Mass. Gen. Laws ch. 90 § 35D merely states that it does not "prohibit the ... replacement ... of any structure" existing before approach protection provisions required their removal. Pls.' Opp. Ex. B at 4. The statute neither "mandates" plaintiffs to replace their previously existing hill nor does it require that MAC grant plaintiffs a permit to do so. Even if Mass. Gen. Laws ch. 90 §§ 35 and 44 could somehow be viewed as plaintiffs suggest, the court has concluded that FAA's hazard determination does not impose any legal requirement that could constitute a taking.

NIED and defendant's motion for summary judgment is GRANTED. The Clerk of the Court shall enter judgment for defendant. Each party shall bear its own costs.

IT IS SO ORDERED.